**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TENNENBAUM LIVING TRUST and MERKIN FAMILY FOUNDATION,<br><br>          Plaintiffs,<br><br>     vs.<br><br>TGLT S.A. and THE BANK OF NEW YORK MELLON,<br><br>          Defendants. | Case No. 1:20-cv-6938 |

**COMPLAINT**

The Tennenbaum Living Trust dated December 6, 2002 ("Tennenbaum") and the Merkin Family Foundation ("MFF," and with Tennenbaum, "Plaintiffs"), as and for their *Complaint* (this "Complaint") against TGLT S.A. (the "Company") and The Bank of New York Mellon (the "Trustee," and with the Company, "Defendants"), respectfully state as follows:

**NATURE OF THE ACTION**

1.      Plaintiffs Tennenbaum and MFF are the legal and beneficial owners of $18 million of convertible subordinated notes due August 3, 2027 (the "Notes") issued by the Company pursuant to that certain *Indenture* dated as of August 3, 2017 (the "Indenture") by and among the Company, the Trustee (as trustee, co-registrar, principal paying agent, and transfer agent), and Banco Santander Rio S.A. (as registrar, Argentine Paying agent, Argentine transfer agent, and representative of the Trustee in Argentina).  A true and correct copy of the Indenture is attached hereto as **Exhibit A**.

2.     Plaintiffs have commenced this action for an award of money damages from the Company on account of a missed interest payment on the Notes.  Under the terms of the Indenture, an interest payment in the amount of $900,000 was due in the aggregate to Plaintiffs on August 15, 2020, and payable on August 18, 2020.[1]  The Company failed to tender such amount to the Trustee, as principal paying agent, for payment to Plaintiffs, and Plaintiffs have not received payment.  As of the filing hereof, the Company has failed to cure this default.

3.     The Company asserts that the Notes no longer exist because of a mandatory conversion of the Notes into equity.  This conversion was purportedly effected in February 2020 by virtue of amendments made to the Indenture in December 2019 as part of a "voluntary" exchange offer.  But Plaintiffs did not participate in the exchange or consent to these amendments to the Indenture, and giving effect to such amendments would unlawfully deprive Plaintiffs of their rights under Sections 508 and 902 of the Indenture and section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b) – all of which guarantee to holders the right to receive payment of principal and interest as and when due and to institute suit for the enforcement of such payment, and further provide that such rights cannot be impaired without the consent of any affected holder.

4.     Accordingly, given the Company's failure to make the August 2020 interest payment as and when due, Plaintiffs are entitled to an award of damages from the Company for the $900,000 interest payment that was due on August 15, 2020, and payable on August 18,

---

[1]   The due date specified in the Indenture was August 15, 2020, but that was a Saturday.  The following Monday, August 17, 2020, was a legal holiday in Argentina.  Accordingly, pursuant to Sections 301 and 307 of the Indenture, the interest payment was payable on August 18, 2020, *i.e.*, the first "Business Day" (as defined in Section 101 of the Indenture) following August 15, 2020.

2020, as well as default interest accruing thereafter.  Plaintiffs reserve all their rights and remedies with respect to payments of principal and interest that will become due in the future.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to sections 1331 (federal question jurisdiction) and 1332 (diversity jurisdiction) of the Judicial Code, 28 U.S.C. §§ 1331 & 1332, and section 322(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77vvv(b).

6.      Venue is proper in this district pursuant to section 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b), and Section 115(a) of the Indenture.

## THE PARTIES

7.      Tennenbaum is a trust settled by Michael E. Tennenbaum and Suzanne S. Tennenbaum ("Settlors"), governed by the laws of the State of California, with its principal place of business in San Juan, Puerto Rico.  Settlors are residents of Puerto Rico.

8.      MFF is a non-profit, non-stock corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Marina del Rey, California.

9.      The Company is a *sociedad anónima* (corporation) organized and existing under the laws of the Republic of Argentina, with its principal place of business at Scalabrini Ortiz 3333, 1st floor, of the City of Buenos Aires, Argentina.

10.      The Trustee is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 240 Greenwich Street, New York, New York.

## FACTUAL BACKGROUND

11.      On August 3, 2017 (the "Issue Date"), Tennenbaum purchased $15 million face amount of Notes (the "Tennenbaum Notes").  At all relevant times, including on August 1, 2020, Tennenbaum has been the holder of record of the Tennenbaum Notes on the official books of the

3

Company for the registration of issuance, ownership, exchange, and transfer of the Notes kept by the Trustee, as co-registrar, pursuant to Section 305 of the Indenture (the "Register").

12.     On the Issue Date, MFF purchased $3 million face amount of Notes (the "MFF Notes").  At all relevant times, including on August 1, 2020, MFF has been the holder of record of the MFF Notes on the Register.

13.     In accordance with the terms of the Indenture and the Notes, interest was due to Plaintiffs on August 15, 2020, and payable on August 18, 2020, in the amount of $750,000 on account of the Tennenbaum Notes, and in the amount of $150,000 on account of the MFF Notes. The Company was obligated to pay to the Trustee, as principal paying agent, in funds available no later than 12:00 noon (New York City time) on Friday August 14, 2020, the amount necessary to make such payment of interest to Plaintiffs.

14.     The Company failed to pay the August 15, 2020 interest payment when due and payable on August 18, 2020.  Accordingly, default interest began to accrue on all unpaid amounts no later than August 19, 2020, at the rate of 16% in accordance with the terms of the Indenture and the Notes.

15.     Section 501(a)(1) of the Indenture provides that it shall be an "Event of Default" under the Indenture if "the Company fails to pay when due (i) any principal or premium due in respect of the Notes or (ii) any interest, Additional Amounts, if any, fees or any other amount due in respect of the [Notes] and such default continues for a period of 5 Business Days."

16.     The Company failed to pay the August 15, 2020 interest payment for a period of 5 Business Days after such payment was due.  As of the filing of this Complaint, the Company has still failed to pay the August 15, 2020 interest payment.

17.     The Company has taken the position that Plaintiffs' Notes no longer exist because of a mandatory conversion of the Notes into equity in February 2020.  This alleged mandatory conversion was purportedly effectuated by virtue of amendments made to the Indenture in connection with a December 2019 "voluntary" exchange of certain of the Notes into equity. Plaintiffs did not exchange their Notes as part of the exchange and did not consent to the amendments entered into in connection therewith.  The purported effect of those amendments was to gut the Indenture's safeguards with respect to mandatory conversion of the Notes.  Then, in February 2020, the Company bootstrapped the "voluntary" exchange into a mandatory conversion, on the basis of the purported amendments made two months earlier.  None of these machinations, however, are lawful or effective.

18.     As originally set forth in the Indenture, Section 1301 permitted the Company to effect a mandatory conversion of the Notes into common shares only in the event of "an initial public offering for [the Company's] Common Shares (or other equity interests) in the United States on the New York Stock Exchange LLC, the NASDAQ Stock Market LLC or any of their successors in which at least U.S.$100,000,000 of [the Company's] Common Shares (or other equity interests) are sold by the Company," which the Indenture defined as a "U.S. IPO." Plaintiffs were agreeable to this provision when they purchased the Notes.  The provision ensured that any mandatory conversion to equity would only take place in the context of an "initial public offering" – *i.e.*, the public issuance of shares to raise new capital from public investors on an established exchange under the jurisdiction of the Securities and Exchange Commission ("SEC").  The successful execution of a U.S. IPO would validate the Company's financial health and prospects, result in the Company having the cash proceeds of the offering, and provide assurance of sound practices, financial and other disclosures, and investor

protections enforced by the SEC.  Mandatory conversion of Plaintiffs' Notes into equity in the event of a U.S. IPO, then, was a provision to which Plaintiffs were agreeable.

19.     The Company, however, never completed the "U.S. IPO" required by Section 1301 of the Indenture to effect a mandatory conversion of the Notes.  Instead, the Company engaged in a two-step scheme – a December 2019 "voluntary" exchange that was accompanied by purported amendments to the Indenture made by the exiting holders, followed by a February 2020 mandatory conversion purportedly effectuated on the basis of those prior amendments.

20.     The holders who participated in the December 2019 exchange (*i.e.*, the holders who were on their way out the door, as they were exchanging their Notes for equity and would no longer be subject to the Indenture) voted to modify Section 1301 of the Indenture to change the definition of "U.S. IPO" to a new term, "Qualified Public Offering Threshold."  That new term was defined as "one or more public offerings, whether related or unrelated, for [the Company's] Common Shares (and/or other equity interests) in (i) the United States on the New York Stock Exchange LLC, the NASDAQ Stock Market LLC or any of their successors and/or (ii) Argentina on the BYMA, in which cumulatively and in the aggregate for such offerings, at least U.S.$100,000,000 of [the Company's] Common Shares (and/or other equity interests) are sold by the Company …."[2]

---

[2]  The quoted language is from Section 2.02(*l*) of the purported *Second Supplemental Indenture* dated as of December 4, 2019 (the "Second Supplemental Indenture").  To be clear, Plaintiffs contest the effectiveness of the Second Supplemental Indenture, and nothing herein should be construed as an admission that the Second Supplemental Indenture is valid or binding.  The Second Supplemental Indenture was preceded by a *First Supplemental Indenture* dated as of April 20, 2018 (the "First Supplemental Indenture"), which made modifications to the Indenture that are not pertinent to the matters alleged herein.  Nonetheless, in the interest of completeness, attached hereto are true and correct copies of the First Supplemental Indenture and the Second Supplemental Indenture (**Exhibit B** and **Exhibit C**, respectively), the Company's press releases dated December 10, 2019 and February 10, 2020 (**Exhibit D** and
*(footnote continued)*

21.     Then, in February 2020, the Company announced that the December 2019 exchange was *itself* the "Qualified Public Offering Threshold" (*i.e.*, what used to be the "U.S. IPO"), even though no new investors were brought in and none of the safeguards and assurances that accompany a public offering were in place or realized.  The Company unilaterally and unlawfully declared that all remaining Notes – including those held by Plaintiffs – had been mandatorily converted into equity.  Adding insult to injury, holders of Notes who converted as part of the "voluntary" exchange in December 2019 received equity at a conversion price of $0.33 per share of common stock, whereas holders of Notes who were allegedly "mandatorily converted" to equity in February 2020 were to receive equity at a conversion price of $0.50 per share of common stock – *i.e.*, a 51.5% difference.  Moreover, the Company never gave holders any indication that it intended to use the amendments made by the exiting holders to compel a mandatory conversion of those who remained (let alone that the conversion would be at a significantly disadvantageous rate).

22.     In short, what happened is this:

- When Plaintiffs bought their Notes in August 2017, they were protected by an Indenture under which the *only* circumstance in which the Notes could be mandatorily converted to equity was if the Company successfully completed a "U.S. IPO" and more than $100,000,000 of new capital was raised in a transaction subject to the jurisdiction of the SEC.

---

**Exhibit E**, respectively).  The offering memorandum dated November 4, 2019 (the "Offering Memorandum") pursuant to which the Company solicited holders of Notes to participate in the exchange is not attached hereto because it is designated "Confidential," but it is incorporated herein by reference.

- But in December 2019, as part of what was represented to be a "voluntary" exchange, a majority of holders converted their own Notes into equity and simultaneously – that is, on their way out – purported to approve amendments to the Indenture that changed the prerequisite for mandatory conversion for those who remained from a "U.S. IPO" to a "Qualified Public Offering Threshold." Because this change affected only those holders (including Plaintiffs) who did not participate in the "voluntary" conversion, it was the functional equivalent of a majority of holders tossing a lighted match behind them as they walked out the door.

- The *coup de grâce* was the Company's assertion in February 2020 that the voluntary exchange *itself* – that is, the decision by some holders (not Plaintiffs) to convert their Notes into equity – qualified as the "Qualified Public Offering Threshold."  And on the basis of that determination, the Company now contends that Plaintiffs' Notes have been mandatorily converted.

23.     Notwithstanding the Company's contentions to the contrary, the machinations set out above are ineffective as to Plaintiffs by virtue of the fundamental right of payment set forth in Section 508 of the Indenture and codified in section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b), and the prohibition in Section 902 of the Indenture on the use of supplemental indentures (such as the Second Supplemental Indenture) to modify what Section 902 defines as "Essential Terms."

24.     Section 508 of the Indenture provides:

SECTION 508.  <u>Unconditional Right of Holders to Receive Principal, Premium, Additional Amounts and Interest</u>.  Notwithstanding any other provision in this Indenture, the Holder of any [Note] shall have the right, which is absolute and unconditional, to receive payment of the principal of (and premium and Additional Amounts, if any) and (subject to Section 307) interest on such [Note] on the respective Stated Maturities expressed in such [Note] (or, in the case of redemption, on the Special Redemption Date or Tax Redemption Date, as applicable) and to convert such [Note] in accordance with Article Thirteen and to institute suit for the enforcement of any such payment and right to convert, and such rights shall not be impaired without the consent of such Holder, including the individual right of such Holder to initiate a trial for the payment of overdue amounts in the form of principal and interest in accordance with the provisions of Section 29 of the Negotiable Obligations Law.

25.     Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b),

provides, in pertinent part:

(b)  <u>Prohibition of impairment of holder's right to payment</u>. Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture [note] to receive payment of the principal of and interest on such indenture [note], on or after the respective due dates expressed in such indenture [note], or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder….

26.     Section 902 of the Indenture provides, in pertinent part:

SECTION 902.  <u>Supplemental Indentures with Consent of Holders</u>.  With the consent of one or more Holders representing not less than a majority in principal amount of the Outstanding Securities, by Act of such Holders delivered to the Company and the Trustee, the Company, when authorized by a Board Resolution, and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of the Holders under this Indenture; <u>provided</u>, <u>however</u>, that no such modification, amendment or supplement may change or affect any one or more of the following terms (the "<u>Essential Terms</u>") without the consent of the Holder of each Outstanding Security affected thereby:

(1)     change the Stated Maturity of the principal of, or any installment of interest on, any Security;

(2)     reduce the principal (including any premium) amount thereof or the rate of interest thereon or any premium or Additional Amount payable thereon;

*       *       *

(4)     impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the Redemption Date);

*       *       *

(9)     modify any of the provisions of this Section 902 or Section 513, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Security affected thereby; or

(10)    modify any provision of the Securities or this Indenture which could reasonably constitute a "fundamental change" under the terms of Section 354 of Argentine Law No. 19,550, as amended (referred to in Article 14 of the Negotiable Obligations Law).

27.     Here, the Company's machinations – including the purported amendments in the Second Supplemental Indenture and the Company's assertion that Plaintiffs' Notes have been mandatorily and involuntarily converted to equity even in the absence of a "U.S. IPO" – violate Sections 508 and 902 of the Indenture and Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b).  The Company has purported to eliminate Plaintiffs' absolute and unconditional right to receive payment of principal and interest as and when due, to institute suit for the enforcement of any such payment, and not to be subject to amendments of the Indenture that change or affect any Essential Terms – all without Plaintiffs' consent.

28.     Finally, even if the amendments effected by the Second Supplemental Indenture were effective as to Plaintiffs (they are not), the Company nevertheless failed to satisfy the conditions for a "Qualified Public Offering Threshold" under amended Section 1301 because the December 2019 voluntary exchange of certain of the Notes into equity did not, and could not,

constitute a "public offering … in which … at least U.S.$100,000,000 of [the Company's] Common Shares … are ***sold by*** the Company" (emphasis added), and any determination by the Company or its board of directors to the contrary is unreasonable as a matter of law.

29.     For all of these reasons, there has been no "mandatory conversion" of Plaintiffs' Notes into equity.

## COUNT FOR MONEY DAMAGES

30.     Plaintiffs repeat and re-allege Paragraphs 1–29, *supra*, as if fully set forth herein.

31.     The August 15, 2020 interest payment on account of the Notes was due and payable to Plaintiffs on August 18, 2020.  The Company failed to make payment when due, or to timely cure such nonpayment, in accordance with the terms of the Notes and the Indenture.

32.     Plaintiffs are entitled to enforce their right to payment, pursuant to Section 508 of the Indenture and Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b). Accordingly, Tennenbaum is entitled to an award of damages in the amount of $750,000, and MFF is entitled to an award of damages in the amount of $150,000, plus, in each case, default interest on all unpaid amounts from and after no later than August 19, 2020, or such earlier date as the Court may determine, at the rate of 16% in accordance with the terms of the Indenture and the Notes.


[The remainder of this page is blank.]

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment awarding Tennenbaum $750,000 and awarding MFF $150,000, plus, in each case, default interest on all unpaid amounts from and after no later than August 19, 2020, or such earlier date as the Court may determine, at the rate of 16% in accordance with the terms of the Indenture and the Notes; for attorneys' fees and the costs of suit; and for such other and further relief as is just and proper.

DATED: August 27, 2020
        */s/ Robert J. Pfister*

Thomas E. Patterson (*pro hac vice* forthcoming)
Robert J. Pfister (RP-8775)
KTBS LAW LLP
*f/k/a Klee, Tuchin, Bogdanoff & Stern LLP*
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Tel: (310) 407-4000
Fax: (310) 407-9090
tpatterson@ktbslaw.com
rpfister@ktbslaw.com

*Attorneys for Plaintiffs Tennenbaum Living Trust and Merkin Family Foundation*