UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                            :
TENNENBAUM LIVING TRUST and MERKIN          :
FAMILY FOUNDATION,                                   :
                                                            :              20 Civ. 6938 (JPC)
                              Plaintiffs,                :
                                                            :              OPINION AND ORDER
           -v-                                              :
                                                            :
TGLT S.A. and THE BANK OF NEW YORK MELLON, :
                                                            :
                              Defendants.             :
                                                            :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        Plaintiffs Tennenbaum Living Trust and the Merkin Family Foundation purchased $18

million in convertible subordinated notes issued by Defendant TGLT S.A. ("TGLT" or the

"Company") pursuant to an Indenture.  A majority of noteholders voted to pass the Second

Supplemental Indenture, which amended the Indenture.  TGLT then converted all notes to equity

pursuant to a provision in that amendment.  Plaintiffs argue that since they did not consent to the

Second Supplemental Indenture and because it impairs their rights under the Indenture, it was not

effective as to them.  Plaintiffs thus claim they are due interest on their notes and have filed this

suit against TGLT and Defendant the Bank of New York Mellon (the "Trustee"), bringing a single

count for "money damages."[1]  Now before the Court is TGLT's motion to dismiss pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons stated below, the Court

grants TGLT's motion to dismiss in part and denies it in part.

------------------------

        [1] The Bank of New York Mellon was dismissed as a Defendant in this action pursuant to a
stipulation under Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure.  Dkt. 11.

## I.  Background

### A.  Facts

Except as otherwise noted, the following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Complaint and the documents attached to it.  Dkt. 4 ("Compl."); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (noting that at the motion to dismiss stage, a court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as any documents "integral" to the complaint, *i.e.*, "where the complaint 'relies heavily upon [the document's] terms and effect'" (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995))).  This includes the Indenture, Second Supplemental Indenture, and TGLT releases dated December 10, 2019 and February 10, 2020.  Compl., Exh. A ("Indenture"), Exh. C ("Second Supplemental Indenture" or "Supp. Indenture"), Exh. D ("Dec. 10 Release"), Exh. E ("Feb. 10 Release").

### 1.  The Indenture

TGLT is a corporation organized under the laws of the Republic of Argentina, with its principal place of business in Buenos Aires.  Compl. ¶ 9.  On August 3, 2017, Plaintiffs purchased convertible subordinated notes of TGLT, offered pursuant to a Private Placement Memorandum, dated July 10, 2017, and issued pursuant to an Indenture (the "Notes").  *Id.* ¶ 1; Indenture § 101.  The Indenture governed the rights and obligations of TGLT and the Noteholders with respect to those Notes.  The Notes were convertible, meaning they could be converted in the manner outlined in the Indenture.  *See* Indenture § 301.  And they were subordinated, meaning they were "expressly made subordinate and junior in right of payment and in liquidation to the prior payment in full of all existing and future" "outstanding obligations (whether actual or contingent) to pay or repay

2

money borrowed by the Company and/or its Subsidiaries." *Id.* §§ 101, 301, 1201.

Plaintiffs, who collectively purchased $18 million worth of Notes, have brought suit alleging that TGLT improperly amended the Indenture to mandatorily covert Plaintiffs' Notes into equity, and in doing so "deprive[d] Plaintiffs of their rights under Sections 508 and 902 of the Indenture and Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b)" (the "TIA").  Compl. ¶¶ 3, 11, 12.[2]

Section 508 of the Indenture gave Plaintiffs, "[n]otwithstanding any other provision in th[e] Indenture," the "absolute and unconditional" right "to receive payment of the principal of . . . and . . . interest on such [Note] . . . and to convert such [Note] in accordance with Article Thirteen and to institute suit for the enforcement of any such payment and right to convert."  Indenture § 508. Section 508 further specified that "such rights shall not be impaired without the consent of such Holder."  *Id.*  As originally written, section 1301, located within the aforementioned Article Thirteen, allowed TGLT to effect a mandatory conversion of the Notes into common shares only if "the Company proceeds with an initial public offering for its Common Shares (or other equity interests) in the United States on the New York Stock Exchange LLC, the NASDAQ Stock Market LLC or any of their successors in which at least U.S.$100,000,000 of its Common Shares (or other equity interests) are sold," which it termed the "U.S. IPO."  *Id.* § 1301.

Section 902 of the Indenture outlined a set of "Essential Terms" that "no such modification, amendment or supplement may change or affect . . . without the consent of the Holder of each Outstanding Security affected thereby."  *Id.* § 902.  This included "the right to convert any Security as provided in Article Thirteen" and "the right to institute suit for the enforcement of any such payment" of principal or interest.  *Id.*  The mandatory conversion threshold provision, *i.e.*, the U.S.

---

[2] As explained below, Plaintiffs appear to now acknowledge that the TIA does not apply to their allegations.

IPO, was not listed as an Essential Term.  *See id.*  Under section 906, any amendments to terms other than Essential Terms could be accomplished by majority vote at a Noteholder meeting, and "[e]xcept as provided above, any modifications, amendments or waivers to the terms and conditions of this Indenture and the Securities shall be conclusive and binding on all [Noteholders], whether or not they have given such consent or were present at any meeting."  *Id.* § 906.

### 2.  The Mandatory Conversion

To accomplish the mandatory conversion that forms the basis of Plaintiffs' claim, TGLT allegedly "engaged in a two-step scheme": "a December 2019 'voluntary' exchange that was accompanied by purported amendments to the Indenture made by the exiting holders, followed by a February 2020 mandatory conversion purportedly effectuated on the basis of those prior amendments."  Compl. ¶ 19.

First, in an Offering Memorandum dated November 4, 2019, TGLT offered Noteholders the option of exchanging their Notes for Class B preferred shares (the "Voluntary Offer").  *Id.* ¶ 20 n.2; Supp. Indenture at 1.  Many Noteholders took this option, and in December 2019, TGLT exchanged approximately 83% of outstanding Notes for 128,282,524 shares of the Class B preferred stock.  Dec. 10 Release at 1; Compl. ¶¶ 19, 20.

The Voluntary Offer was part of a broader stock offering by TGLT:  Pursuant to a prospectus dated November 1, 2019, TGLT offered (1) up to 80 million newly issued shares of Class A convertible preferred stock in exchange for cash or certain property and (2) up to 250 million newly issued shares of Class B convertible preferred stock or American Depository Shares representing such Class B preferred stock in exchange for cash or Convertible Notes (collectively, the "Global Offer").  Dec. 10 Release at 2; Feb. 10 Release at 1.  As a result of the Global Offer, TGLT issued 39,033,842 new shares of Class A preferred stock and 140,796,721 new shares of

Class B preferred stock, the latter of which included those shares exchanged in connection with the Voluntary Offer.  Dec. 10 Release at 2.

Before the Voluntary Offer closed, TGLT solicited consent from the Noteholders to amend the Indenture.  Supp. Indenture at 1.  At a November 22, 2019 meeting, Noteholders holding a majority of the outstanding Notes voted to approve the Second Supplemental Indenture.  *Id.*[3]  The Second Supplemental Indenture, dated December 4, 2019, amended section 1301.  While the original section 1301 provided for a mandatory conversion in the event of the U.S. IPO, *i.e.*, a U.S. initial public offering of at least $100 million, the amended version of section 1301 allowed for a mandatory conversion in the event of cumulative public offerings in the U.S. and Argentina in which TGLT "sold" at least $100 million of "Common Shares (and/or other equity interests)." *Id.* § 2.02.  The Second Supplemental Indenture termed this the "Qualified Public Offering Threshold." *Id.*  TGLT's Board of Directors (the "Board") was authorized to, "in good faith," determine if this standard was met. *Id.*  The Board's determination was to be "conclusive absent manifest error." *Id.*

To complete this "scheme," TGLT announced in February 2020 that the Qualified Public Offering Threshold, as defined in the amended section 1301, had been met.  Feb. 10 Release at 1.  The Complaint states that "the Company announced that the December 2019 exchange was *itself* the 'Qualified Public Offering Threshold' . . . even though no new investors were brought in and none of the safeguards and assurances that accompany a public offering were in place or realized." Compl. ¶ 21.  Although the Complaint suggests that the Board found that only the Voluntary Offer met that threshold, the documents attached to the Complaint reflect that the Board concluded the Global Offer more broadly met the Qualified Public Offering Threshold.  *See* Feb. 10 Release at

---

[3] The Second Supplemental Indenture was preceded by a First Supplemental Indenture, *see* Compl., Exh. B, which is not relevant to this suit, *see* Compl. ¶ 20 n.2.

1 (stating that the Board had determined the consummation of the offers for Class A preferred shares and Class B preferred shares as set out in the November 1, 2019 Offering Memorandum met the Qualified Public Offering Threshold).  After making this finding, TGLT forcibly converted the outstanding convertible Notes into common stock.  *See id.*  Noteholders who participated in the Voluntary Offer received equity at a conversion price of $0.33 per share of common stock, but Noteholders who did not participate in the Voluntary Offer, like Plaintiffs, received equity at a higher conversion price of $0.50 per share of common stock.  Compl. ¶ 21.

## B.  Procedural History

Plaintiffs filed this suit on August 27, 2020.  The case was originally assigned to the Honorable Lorna G. Schofield but was reassigned to the undersigned on September 30, 2020.  *See* Dkt. 19.

In their Complaint, Plaintiffs bring a single "count for money damages," seeking $900,000 for interest allegedly due on the Notes as of August 15, 2020.  Compl. ¶¶ 2, 4, 30-32.  Plaintiffs make two principal arguments.  First, Plaintiffs contend that Defendants violated sections 508 and 902 of the Indenture and section 316(b) of the TIA by "eliminat[ing] Plaintiffs' absolute and unconditional right to receive payment of principal and interest as and when due, to institute suit for the enforcement of any such payment, and not to be subject to amendments of the Indenture that change or affect any Essential Terms."  *Id.* ¶ 27.  Second, Plaintiffs assert that even if the conversion was valid, there was no "Qualified Public Offering Threshold" under the amended section 1301.  *Id.* ¶¶ 21, 22, 28.  TGLT has now moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.  Applicable Legal Standard

### A.  Rule 12(b)(6)

For a complaint to survive a Rule 12(b)(6) motion to dismiss, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015), that tenet "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice,'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alteration in original) (quoting *Iqbal*, 556 U.S. 687).

### B.  Breach of Contract

The parties agree that New York law applies to a challenge to the Indenture, as the Indenture contains a New York choice-of-law provision.  Indenture § 112; *see* Motion at 7 n.3, 8; Opposition at 12-13; *Texaco A/S v. Com. Ins. Co.*, 160 F.3d 124, 128 (2d Cir. 1998) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997))).[4]

---

[4] Argentine law applies to actions taken at Noteholders meetings.  *See* Indenture § 906 ("Any meeting of Holders shall be governed by the [Argentine] Negotiable Obligations Law with respect to all matters not specified herein."); *id.* § 112 ("[C]ertain matters relating to meetings of Holders are governed by Argentine law."); *id.* at A-9 ("[C]ertain matters relating to meetings of Holders shall be governed by the [Argentine] Negotiable Obligations Law and other applicable Argentine laws and regulations.").  New York law applies to the other provisions of the Indenture.

In New York, interpretation of an indenture provision "is a matter of basic contract law." *Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 39 (2018) (quoting *Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 559 (2014)).  Courts must "construe an indenture subject to the rule that 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'"  *Id.* (quoting *Quadrant Structured Prod. Co.*, 23 N.Y.3d at 559-560).  In reviewing an indenture, "particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby."  *Id.* (quoting *Kolbe v. Tibbetts*, 22 N.Y.3d 344, 353 (2013)).

### III.  Discussion

TGLT moves to dismiss, arguing that (1) the TIA does not apply to these claims, (2) the Second Supplemental Indenture properly amended the Indenture, and (3) the Board did not commit manifest error in determining that the Global Offer met the Qualified Public Offering Threshold.  The Court addresses each point in turn.

### A.  The Applicability of the TIA

The Complaint's single count for "money damages" appears to be premised on the theory that Defendants violated both the Indenture and the TIA.  *See* Compl. ¶¶ 30-32 (stating that Plaintiffs seek to "enforce their right to payment, pursuant to Section 508 of the Indenture and Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b)"); *id.* ¶ 23 (arguing that

---

*See id.* § 112 ("All other matters in respect of the Securities and this Indenture … are governed by, and construed in accordance with, the laws of the State of New York, United States of America.").  TGLT speculates that Plaintiffs styled the Complaint as a claim for missed interest payments because Argentine law, which applies to the actions taken at Noteholder meetings, required Plaintiffs to challenge the results of a meeting within three months, which did not occur.  *See* Motion at 6-7.  Plaintiffs construe this as arguing that the Complaint is barred by the Argentine statute of limitations.  Opposition at 12-13.  Because the Court does not interpret TGLT's motion as raising a statute of limitations argument, the Court does not address the impact of Argentine law on Plaintiffs' claims.

the mandatory conversion was "ineffective as to Plaintiffs by virtue of the fundamental right of payment set forth in Section 508 of the Indenture and codified in Section 316 of the [TIA]"); *id.* ¶ 5 (asserting jurisdiction under 28 U.S.C. §§ 1331, 1332, federal question jurisdiction and diversity jurisdiction, respectively, as well as section 322(b) of the TIA).

Section 316(b) applies only to "indenture[s] to be qualified."  15 U.S.C. § 77ppp(b).  An "indenture to be qualified" is "(A) the indenture under which there has been or is to be issued a security in respect of which a particular registration statement has been filed, or (B) the indenture in respect of which a particular application has been filed."  *Id.* § 77ccc(9).  Sections 17eee and 17fff of the TIA deal with which securities must be registered, and section 304(b) of the TIA provides that those sections do not apply "to any of the transactions exempted from the provisions of Section 5 of the Securities Act of 1933 [(the "Securities Act")] by Section 4 thereof."  *Id.* § 77ddd.  And section 4 of the Securities Act exempts "transactions by an issuer not involving any public offering."  *Id.* § 77d(a)(2).

The Notes were issued pursuant to a Private Placement Memorandum, not a public offering.  Indenture at 1, § 101; *see* Motion at 15.  The Indenture was thus exempted under section 4 of the Securities Act and did not need to be registered under the TIA.  Accordingly, the Indenture was not an "indenture to be qualified" covered by section 316(b) of the TIA.  While Plaintiffs seemingly do not dispute this, *see* Dkt. 23 at 1-2 (in letter response to TGLT's pre-motion letter, taking the position that the applicability of section 316(b) of the TIA is "irrelevant"); *see generally* Opposition, they nonetheless have not moved to amend their Complaint.  To the extent Plaintiffs bring a claim under the TIA, it must be dismissed.

However, the Court's inquiry does not stop there.  Even if not qualified under the TIA, if an indenture incorporates the TIA, in whole or in part, the Court "may look to the TIA for guidance

as to the intended application of those Indenture provisions." *CNH Diversified Opps. Master Acct.,*

*L.P. v. Cleveland Unlimited, Inc.*, 36 N.Y.3d 1, 10 (2020), *reargument denied*, 36 N.Y.3d 1043

(2021).  Nonetheless, "[w]hile contracts may incorporate particular laws as contract terms, the

contract must do so with specificity." *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186

(2d Cir. 2005).

Plaintiffs argue that even if the TIA does not technically cover the Indenture, the Indenture

incorporated the protections of section 316(b) of the TIA.  *See* Dkt. 23 at 1-2 ("But the applicability

*vel non* of Section 316(b) of the [TIA] is irrelevant because Section 508 of the Indenture . . .

incorporates the protections provided to a noteholder by Section 316(b).").  Specifically, Plaintiffs

contend that section 508 of the Indenture, which governs the Noteholders' "absolute and

unconditional" right to receive payment, "derives from" section 316(b) of the TIA.  Opposition at

4.  Section 316(b) of the TIA, entitled "Prohibition of impairment of holder's right to payment,"

reads, in relevant part:

> Notwithstanding any other provision of the indenture to be qualified, the right of
> any holder of any indenture security to receive payment of the principal of and
> interest on such indenture security, on or after the respective due dates expressed
> in such indenture security, or to institute suit for the enforcement of any such
> payment on or after such respective dates, shall not be impaired or affected without
> the consent of such holder . . . .

15 U.S.C. § 77ppp(b).  Plaintiffs thus contend that the Indenture "includes the language of the

[TIA] as a contract term," meaning "the term governs as a contractual matter and the effect is the

same as if the Trust Indenture Act applied by its own force."  Opposition at 4 n.2.

But this case is thus quite unlike those where the New York Court of Appeals has used

case law governing the TIA to examine a non-qualified indenture.  *See, e.g.*, *CNH Diversified*

*Opps. Master Acct., L.P.*, 36 N.Y.3d at 5 (examining an indenture that, "in addition to restating

some of the statutory language, . . . incorporated by reference '[a]ny provision of the TIA which

is required to be included in a qualified indenture'"). The Indenture referred to the TIA in select provisions—but not in section 508. *See* Indenture §§ 602, 608-609, 613, 702, 1003; *see also Watermill Exp., Inc. v. MV Ponce*, 506 F. Supp. 612, 614 (S.D.N.Y. 1981) ("When parties choose to incorporate only a portion of a statute into the contracts governing their transaction, then it is only those incorporated provisions that become part of the agreement.").

Thus, while the language of section 508 of the Indenture and section 216(b) of the TIA may be similar, the parties did not explicitly incorporate the TIA into the Indenture. Because the Court cannot conclude that the parties intended to incorporate the language of the TIA as a contract term, it finds case law interpreting section 316(b) to be, at best, persuasive. The Indenture remains a creature of contract, and the Court must abide by the parties' intent, as reflected in the language of the Indenture itself.

## B. The Validity of the Second Amended Indenture

With this in mind, the Court turns to whether the Second Supplemental Indenture violated the Indenture. The Indenture required that any amendments to Essential Terms be approved by every Noteholder, but allowed any amendments to non-Essential Terms to be accomplished by majority vote. Indenture §§ 902, 906; Compl. ¶ 26. Plaintiffs appear to concede that the mandatory conversion threshold was not an Essential Term. *See* Opposition at 17. They also acknowledge that a majority of Noteholders approved the amendment to the mandatory conversion threshold. Compl. ¶ 22. Nonetheless, Plaintiffs argue that amending the mandatory conversion provision "impair[ed]" certain Essential Terms: their "absolute and unconditional rights" "(i) 'to receive payment of the principal of . . . and . . . interest' on their Notes when due, (ii) 'to convert [their Notes] in accordance with Article Thirteen,' and (iii) 'to institute suit for the enforcement of any such payment and right to convert,'" as protected by sections 507 and 902 of the Indenture.

11

Opposition at 10 (alterations in original) (quoting Indenture § 508); *see* Indenture §§ 508, 902; Opposition at 14, 18.   Neither argument is convincing.

### 1.  Plaintiffs' Conversion Rights

First, Plaintiffs contend that the amendment "impermissibly impaired Plaintiffs' 'absolute and unconditional' 'right to convert [their Notes] as provided in Article Thirteen,'" because it (1) deprived them of "all future opportunities to exercise their voluntary conversion rights under Article 13 at a more favorable point," (2) allowed TGLT to convert the Notes as part of a "distressed exchange," and (3) immunized the Board's decision.  Opposition at 14-15 (quoting Indenture §§ 507, 902).

But Plaintiffs' power to voluntarily convert their Notes was always limited by the possibility of a mandatory conversion pursuant to section 1301.  The amendment did not deprive Plaintiffs of some pre-existing power to convert their Notes; it simply amended the threshold at which the Company could force a mandatory conversion.  And while section 902 listed as an Essential Term Plaintiffs' "right to convert [their Notes] as provided in Article Thirteen," it did not list the mandatory conversion threshold itself as an Essential Term.  Thus, to hold that the mandatory conversion threshold could only be amended by unanimous vote would "require the court to add a substantive provision for which the parties did not bargain."  *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 992 (S.D.N.Y. 1989).  The parties could have contracted to protect the mandatory conversion threshold, but they elected not to do so.  Thus, while Plaintiffs may be unhappy with the amended threshold and the standard of review for the Board's decision, they were not required to consent to this amendment, so long as a majority of

Noteholders did.

### 2. Plaintiffs' Payment Rights and Right to Bring Suit

Second, Plaintiffs argue the Second Supplemental Indenture impaired their "absolute and unconditional" right to "receive payment of the principal of" and "interest on" the Notes and "to institute suit for the enforcement of any such payment," because the Second Supplemental Indenture "enabled the purported outright extinguishment of the Notes on terms that Plaintiffs never accepted." Opposition at 16; *see* Indenture §§ 508, 902. Plaintiffs suggest that section 508 protects even "indirect[]" impacts on a Noteholders' rights to obtain payment and to sue. Opposition at 16; *see* Compl. ¶ 27 (alleging that "the Company's machinations—including the purported amendments . . . and the Company's assertion that Plaintiffs' Convertible Notes have been mandatorily and voluntarily converted"—affected Plaintiffs' rights to payment and to institute suit).

This argument fails for substantially the same reasons as above. The Second Supplemental Indenture did not "extinguish" the Notes. Instead, it lowered the threshold for the mandatory conversion—a provision that *always* conditioned Plaintiffs' right to obtain payment or bring suit. Section 508 cannot reasonably be read to prohibit any provision that might eventually impact a Noteholders' right to receive payment or to sue for such payment. To hold as much would be in tension with section 902, which enumerates specific provisions as Essential Terms, subject to change only be unanimous consent. All other provisions, like the mandatory conversion provision, were subject to amendment only by majority vote. The Court is bound by the unambiguous language of the Indenture, which did not require that the mandatory conversion provision be amended by unanimous vote.

In support of their argument otherwise, Plaintiffs rely almost exclusively on case law

interpreting the TIA, arguing that precedent from the Second Circuit and New York Court of Appeals bars any indirect impact on a noteholder's "legal rights to payment and to bring suit." Opposition at 16 (citing *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1 (2d Cir. 2017); and then citing *CNH Diversified Opps. Master Acct., L.P.*, 36 N.Y.3d at 10, 14). As stated above, the TIA does not apply to the Indenture either on its face or as a contract term. But even if the TIA did apply, it would not save Plaintiffs' claim.

In *Marblegate*, the Second Circuit held that section 316(b) of the TIA "prohibits non-consensual amendments of core payment terms (that is, the amount of principal and interest owed, and the date of maturity)." 846 F.3d at 7. In that case, a company underwent a restructuring transaction, the "Intercompany Sale," whereby it shifted its assets to a new subsidiary and then gave certain consenting creditors debt and equity in the subsidiary. *Id.* at 4.[5] While the old company would still exist and the Indenture would not be altered, "the foreclosure would transform the [company] into an empty shell." *Id.* The Second Circuit concluded this did not violate the TIA, holding that although section 316(b) on its face broadly prohibits any actions that "impaired or affected" certain rights, this could not be read "to mean any possible effect," as that "would transform a single provision of the TIA into a broad prohibition on any conduct that could influence

---

[5] Specifically, as explained by the Second Circuit:

> Secured creditors consenting to the Intercompany Sale would first exercise their preexisting rights under the 2014 Credit Agreement and Article 9 of the Uniform Commercial Code to foreclose on [defendant's] assets. In addition, the secured creditors would release [the defendant] from the Secured Parent Guarantee. That release in turn would effect a release of the Notes Parent Guarantee under the Indenture. With the consent of the secured creditors (but without needing the consent of the unsecured creditors), the collateral agent would then sell the foreclosed assets to a subsidiary of [the defendant] newly constituted for purposes of the Intercompany Sale. Finally, the new . . . subsidiary would distribute debt and equity only to consenting creditors and continue the business.

*Marblegate Asset Mgmt., LLC*, 846 F.3d at 4.

the value of a note or a bondholder's practical ability to collect payment." *Id.* at 7 (citing 15 U.S.C. § 77ppp(b)). The Circuit nonetheless noted that the bondholders in that case were not left without recourse, as they retained their "legal right" to obtain payment by bringing suit. *Id.* at 16-17.

In *CNH*, the New York Court of Appeals seized upon this latter finding, concluding that an amendment that impairs a bondholder's "legal right" to bring suit violates section 316(b) of the TIA. 36 N.Y.3d at 15. The indenture at issue in *CNH* incorporated by reference the TIA. *Id.* at 5. That indenture contained a provision—which closely "tracked" section 316(a) of the TIA— allowing a majority of noteholders to direct the trustee to exercise a range of remedies in the event the company defaults on the notes. *See id.* ("[T]he Holders of a majority in principal amount of the outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee."); 15 USC § 77ppp(a)(1) (stating that covered indentures "shall automatically be deemed (unless it is expressly provided therein that any such provision is excluded) to contain provisions authorizing the holders of not less than a majority in principal amount of the indenture securities . . . to direct the time, method, and place of conducting any proceeding for any remedy available to such trustee, or exercising any trust or power conferred upon such trustee, under such indenture"). The majority of noteholders directed the trustee to execute a "strict foreclosure" pursuant to the Uniform Commercial Code, whereby the trustee transferred any consenting noteholders' interests to a new company and "cancelled" the notes of any noteholders who did not consent to transfer their notes to stock. *CNH Diversified Opps. Master Acct., L.P.*, 36 N.Y.3d at 5-7. The New York Court of Appeals found the strict foreclosure violated section 316(b) because it extinguished the noteholders "legal right" to obtain payment. *Id.* at 14-15. In so holding, the court focused on the "structure and design of the corresponding TIA provisions," *id.* at 11, emphasizing that section 316(b) of the TIA applies "notwithstanding

any other provision of the indenture," *id.* at 16.   Thus even though the section 316(a) of the TIA gave the trustee broad recourse to take action, section 316(b) cabined those actions.

Plaintiffs contend that the "Court of Appeals' holding and analysis in *CNH* dictate the result here."   Opposition at 20.   They argue that "[j]ust as the strict foreclosure in *CNH* impermissibly extinguished the minority noteholders' payment rights (by extinguishing their notes and replacing them with equity) without their consent, here the mandatory conversion of Plaintiffs' Notes on the basis of a conversion trigger to which Plaintiffs never consented violates Plaintiffs' rights under section 508 of the Indenture."   *Id.*

But *CNH* is distinguishable.   The court in *CNH* considered the interplay of two TIA provisions, relying heavily on the "structure and design" of the TIA to find that section 316(b)'s "notwithstanding any other provision" language limited another broad provision of the TIA, section 316(a).   36 N.Y.3d at 11.   Here, by contrast, the Court must examine the interplay of sections 508 and 902 of the Indenture.   While section 508 is similar to section 316(b) of the TIA, section 902 of the Indenture has no even arguable analogue in the TIA.   And section 902 reflects the parties' intent to allow the majority of Noteholders to amend certain provisions, including the mandatory conversion threshold provision, by majority vote.   *CNH* thus does not mandate that the Court read 508 as implicitly limiting the parties' explicit intent to allow certain amendments by majority vote.   Moreover, as stated above, the Second Supplemental Indenture did not "extinguish" the Notes.   As Plaintiffs even tacitly admit, the amendment "d[id] not in and of [itself] constitute the elimination of the legal right."   Opposition at 17.   Instead, this case falls squarely within *Marblegate*—the Second Supplemental Indenture did not directly impact Plaintiffs' rights to obtain payment and to sue or amend a core payment term, and therefore would not violate section

316(b) if that provision applied.[6]

In sum, Plaintiffs' claims based on the TIA and the Indenture must be rejected.  The Second Supplemental Indenture did not amend a "core" payment term as would be prohibited under *Marblegate*, and did not otherwise directly bar Plaintiffs' rights to obtain payment or to bring suit. Section 508 cannot be read to prohibit any action that might have an indirect impact on those rights, either under the plain terms of the Indenture or the TIA.

## C.  The Board's Decision

Finally, the Court turns to Plaintiffs' argument that even if the amendment was proper, the conversion was improper because the Board manifestly erred in concluding the Voluntary Offer was not a "Qualified Public Offering" as defined in the amended section 1301.  The amended section 1301 allowed for a mandatory conversion upon the occurrence of a "Qualified Public Offering Threshold," which it defined as,

> [i]f the Company proceeds with one or more public offerings, whether related or unrelated, for its Common Shares (and/or other equity interests) in (i) the United States on the New York Stock Exchange LLC, the NASDAQ Stock Market LLC or any of their successors and/or (ii) Argentina on the BYMA, in which, cumulatively and in the aggregate for such offerings, at least U.S.$100,000,000 of its Common Shares (and/or other equity interests) are sold by the Company.

Supp. Indenture § 2.02.  The Board was to determine "in good faith" if that standard was met, and its determination was to "be conclusive absent manifest error."  *Id.*

---

[6] To the extent Plaintiffs suggest that under *CNH*, any downstream impact on a noteholders' right to receive payment or bring suit violates section 316(b) of the TIA, such a reading would be in conflict with *Marblegate*'s holding that section 316(b) is a narrow provision limited to "core matters" and does not broadly cover the "practical ability to collect payments."  846 F.3d at 7. Because the TIA is a matter of federal law, the Second Circuit's interpretation controls over any conflicting law from the New York Court of Appeals.  *See Affiliated Comput. Servs., Inc. v. Wilmington Tr. Co.*, 565 F.3d 924, 928 (5th Cir. 2009) ("[I]nterpretation of the TIA is a matter of federal law."); *see also United States v. Peters*, 732 F.3d 93, 103 (2d Cir. 2013) ("Because the question . . . involves the interpretation of a federal statute, we examine it under federal law.").

Although Plaintiffs alleged in the Complaint that the Board's decision was "unlawful," Compl. ¶ 21, and "unreasonable as a matter of law," *id.* ¶ 28, they have now clarified their argument, asserting that "[t]he Board's conclusion that a private exchange of debt for equity was actually a 'public offering' in which shares were 'sold' by the Company is . . . indefensible, manifestly erroneous, and *ipso facto* in bad faith," *see* Opposition at 22.  First, Plaintiffs stress that a "public offering" is "generally understood to be the sale of securities to the general public to raise capital for the issuer," *id.* at 20, and must be registered with the U.S. Securities and Exchange Commission ("SEC"), *id.* at 22-23.  And as Plaintiffs note, the Voluntary Offer was issued pursuant to a Private Placement Memorandum in the United States and was not registered with the SEC. *Id.*  Second, Plaintiffs assert that because the Qualified Public Offering Threshold required that over $100 million shares be "sold by" TGLT, TGLT was required to "raise fresh capital."  *Id.*  But in the Voluntary Exchange, Plaintiffs argue, "the Company issued equity in exchange for the redemption of certain outstanding Notes, without infusing any cash proceeds into the Company's balance sheet."  *Id.* at 23.

TGLT moves to dismiss on the basis that Plaintiffs have not alleged any non-conclusory facts suggesting the Board committed manifest error in concluding that the Qualified Public Offering Threshold had been met.  *See* Motion at 12-14; *see also* Reply at 7.  TGLT does not seriously dispute that the Voluntary Offer was a private offering.  Instead, TGLT emphasizes that the Board determined it was the broader *Global Offer* that met the Qualified Public Offering Threshold.  *See* Feb. 10 Release at 1.  Pursuant to the Global Offer, TGLT offered up to 80 million shares of new Class A preferred stock and up to 250 million shares of Class B preferred stock.  *See* Dec. Release at 2; Feb. Release at 1.  The Global Offer was offered publicly in Argentina and was registered with the Argentine Securities Commission.  *See* Dec. Release at 2; Feb. Release at 1.

18

TGLT contends that the fact the Global Offer was extended in the United States on a private basis—through the Voluntary Offer—does not mean the Board erred in finding the Global Offer itself was public. Reply at 7. Indeed, TGLT states that "it is common in a global securities offering for a public offering in the principal market to be extended outside the principal market on a private placement basis solely to institutional and other sophisticated investors." *Id.* at 8 & n.7 (citing Edward F. Greene et al., *U.S. Regulation of the International Securities and Derivatives Markets* § 7.01 (11th & 12th eds. 2014-2017)). Finally, TGLT asserts that the Second Supplemental Indenture did not require that the shares be sold for cash, and that the Board did not commit manifest error in determining that the $179,830,563 in preferred stock issued pursuant to the Global Offer exceeded the Qualified Public Offering Threshold. *Id.* at 8.

At this stage, the Court cannot conclude that Plaintiffs' claim is not plausible on its face. While Plaintiffs have not alleged any facts suggesting the Board acted in bad faith, they have alleged sufficient facts to state a claim that the Board's decision is manifestly erroneous. Although the Second Supplemental Indenture says there must be "one or more public offerings" over a certain threshold, it does not define "public" or state whether a "public offering" can include a private piece. *See* Supp. Indenture § 2.02. And although the Second Supplemental Indenture did not explicitly require the Company to receive "fresh capital," it did say that the shares must be "sold" "in" the public offering. *Id.* TGLT announced that it issued $39,033,842 in new shares of Class A preferred stock and $140,796,721 in new shares of Class B preferred stock, totaling $179,830,563. Feb. 10 Release. However, while the *total* amount of preferred stock issued pursuant to the Global Offer was worth over $100 million, the stock exchanged for the Notes represented a substantial portion of this. *See* Dec. 10 Release at 1 (stating that $128,282,524 of Notes and $11,042,666 of "Deferred Interest Entitlements" were exchanged at a rate of one share

of Class B Preferred Stock per $1.00 of Notes or Deferred Interest Entitlements); *id.* at 2 (stating

that the total issuance of 179,830,563 shares included "the shares of Class B Preferred Stock to be

issued in respect of the tendered Convertible Notes").  Thus if the private offering in the United

States could not be counted as part of the "public" offering, those shares could ostensibly not count

toward the Qualifying Public Offer Threshold.

And while TGLT couches its argument in terms of the sufficiency of Plaintiffs' factual

allegations, *see, e.g.*, Opposition at 7 ("Plaintiffs . . . do not allege facts showing that the Board's

determination . . . was in bad faith or manifestly erroneous."); Reply at 8 ("Plaintiffs make no

allegation demonstrating that the Board's determination to the contrary was in bad faith or

manifestly erroneous." (citation omitted)), its opposition reads more like a motion for summary

judgment, asking the Court to conclude as a matter of law that the Board's decision was not

manifestly erroneous.  But TGLT has not even cited to any case law regarding the threshold for

determining "manifest error."  And while it may turn out that it is "common" to make private

offerings in the United States when performing a foreign public offer, TGLT offers no reason why,

at this stage, the Court should consider facts found in sources other than the Complaint and the

documents attached thereto.[7]  Moreover, TGLT has not adequately explained why, even assuming

private offerings are common, that fact would support a finding that the offer here was public

under the Indenture.

In sum, the Court cannot say that Plaintiffs have failed to state a claim that the Board

engaged in manifest error in concluding that there was a "public" offering at which more than $100

million in shares or other equity were "sold."  That is not to say that the Board's decision was

---

[7] The Court is wary of the number of external sources TGLT has cited in moving to dismiss, particularly because TGLT has not justified the Court's consideration of those materials at this stage.  *See* Motion at 4, 5, 10.  The Court does not consider these sources in reaching its decision.

manifestly erroneous—only that Plaintiffs' claim is plausible.  Accordingly, TGLT's motion to dismiss the Complaint on this basis is denied.

## IV.  Conclusion

For the aforementioned reasons, TGLT's motion to dismiss is granted in part and denied in part.  To the extent Plaintiffs' raise a claim under the TIA, that claim is dismissed.  And although the Court concludes that the amendment did not violate the Indenture, the Court cannot conclude, at this stage, that the Board's determination that there was a public offer involving the sale of more than $100 million in shares was not manifestly erroneous.  The parties' requests for oral argument, Dkts. 30, 33, are denied.

The Court will hold an Initial Pretrial Conference ("IPTC") on September 21, 2021, at 10:30 a.m.  At the scheduled time, counsel for all parties should call (866) 434-5269, access code 9176261.  No later than seven days prior to the IPTC, the parties must submit a proposed Civil Case Management Plan and Scheduling Order.  *See* https://www.nysd.uscourts.gov/hon-john-p-cronan.

The Clerk of the Court is respectfully directed to terminate the motion pending at Docket Number 27.

SO ORDERED.

Dated: August 30, 2021
       New York, New York

_____
JOHN P. CRONAN
United States District Judge

21