UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                        :
TENNENBAUM LIVING TRUST *et al.*,                       :
                                                        :
                               Plaintiffs,              :
                                                        :          20 Civ. 6938 (JPC) (JLC)
                -v-                                      :
                                                        :          FINDINGS OF FACT AND
                                                        :          CONCLUSIONS OF LAW
GCDI S.A. f/k/a/ TGLT S.A.,                             :
                                                        :
                               Defendant.               :
                                                        :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiffs Tennenbaum Living Trust ("Tennenbaum") and Merkin Family Foundation

("Merkin"), which in 2017 invested in debt securities issued by Defendant GCDI S.A. f/k/a/ TGLT

S.A.[1] (the "Notes"), bring this action for breach of contract in order to recover unpaid interest

allegedly owed by Defendant to them as holders of some of the Notes.  Compl. ¶¶ 30-32, at 12.  In

response, Defendant contends that no interest is due to Plaintiffs because following a mandatory

conversion of the Notes to Defendant's common stock in February 2020 (the "Mandatory

Conversion"), the Notes no longer exist and, therefore, Plaintiffs no longer own them.  Dkt. 43

---

[1] In the Complaint that initiated this action, Plaintiffs brought their claims against "TGLT S.A.," as that was Defendant's name both when the Complaint was filed and when the events it describes occurred.  *See generally* Dkt. 1 ("Compl.").  Accordingly, the Court's prior decision on Defendant's motion to dismiss referred to Defendant as "TGLT".  *See generally Tennenbaum Living Tr. v. TGLT S.A.*, No. 20 Civ. 6938 (JPC), 2021 WL 3863117 (S.D.N.Y. Aug. 30, 2021). On October 19, 2022, Defendant filed a notice informing the Court that, as of September 12, 2022, its name had changed from "TGLT S.A." to "GCDI S.A.".  Dkt. 101.  Subsequently, with Plaintiffs' consent, *see* Dkt. 107, the Court ordered that the caption in this case be changed to reflect Defendant's current corporate name.  Dkt. 108.  Thus, Defendant was known as TGLT when the underlying events relevant to this case took place, but it now is known as GCDI.  The Court will refer to the entity simply as "Defendant" rather than attempting to switch back and forth between the two names.

¶¶ 3, 17, 19, 21-22, 27.  In the Complaint, Plaintiffs maintained that the Mandatory Conversion was not authorized by the indenture governing the Notes (the "Indenture"[2]), and, therefore, that they continue to own Notes on which interest is due, for two reasons:  first, because the provision of the Original Indenture that purportedly authorized the Mandatory Conversion, section 1301, had been amended in 2019 (the "2019 Amendment") in violation of provisions of both the Original Indenture and the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §§ 77aaa *et seq.*, Compl. ¶ 27, and second, because even had that amendment been valid, it authorized a mandatory conversion of the Notes only upon satisfaction of a condition that had not, in fact, been met when the Mandatory Conversion occurred, *id.* ¶ 28.[3]  On those two independent bases, Plaintiffs sought the unpaid interest due on their Notes, plus pre-judgment interest on that amount.  Compl. at 12.

On November 25, 2020, Defendant moved to dismiss the Complaint in its entirety.  Dkts. 27-30.  Following full briefing, *see* Dkts. 31-33, 35, the Court issued an Opinion and Order on August 31, 2021 granting the motion to dismiss in part and denying it in part.  *Tennenbaum Living Tr.*, 2021 WL 3863117.  In particular, the Court held that the TIA does not govern the Indenture,

---

[2] As will be discussed, on December 4, 2019, Defendant executed a Second Supplemental Indenture that contained various provisions amending the Indenture.  *See* Dkt. 83-27 ("Second Supp. Inden.").  When unmodified, the term "Indenture" refers to the Indenture as amended following the execution of the Second Supplemental Indenture, which was the governing version of the document as of the date of the Mandatory Conversion.  The Court will employ the term "Original Indenture" to refer to the version of the Indenture in effect before its amendment through the Second Supplemental Indenture.

[3] In the Complaint, Plaintiffs sued both Defendant and The Bank of New York Mellon ("BONY"), the alleged trustee, co-registrar, principal paying agent, and transfer agent under the Indenture.  Compl. ¶ 1; *see also* Dkt. 83-15 ("Inden.") at 1.  On September 11, 2020, before BONY had appeared in this case and shortly after the Complaint was filed, Plaintiffs filed a stipulation and proposed order under which they voluntarily dismissed their claims against BONY and, in return, BONY agreed to be bound by any judgment issued by the Court in this case.  Dkt. 10.  On September 14, 2020, the stipulation was so-ordered by the Honorable Lorna G. Schofield, to whom this case was then assigned.  Dkt. 11.  The case was transferred to the undersigned soon thereafter on September 29, 2020.  *See* Notice of Case Reassignment dated Sept. 29, 2020.

*id.* at *4-5, that the Original Indenture did not otherwise incorporate the relevant provisions of the TIA, *id.* at *5, and that the Second Supplemental Indenture did not violate the Original Indenture and therefore validly amended the Original Indenture, *id.* at *6-8.  Thus, the Court rejected Plaintiffs' arguments that the Mandatory Conversion was invalid because it was inconsistent with the TIA and the Original Indenture.  However, the Court held that the Complaint stated a claim that the Mandatory Conversion was unlawful because it was not authorized by the Indenture, as amended.  *Id.* at *8-10.  Thus, following the August 31, 2021 Opinion and Order, Plaintiffs' sole remaining claim is that the Mandatory Conversion failed to extinguish their ownership interest in the Notes they purchased because the Conversion was not authorized under section 1301 of the Indenture, as amended, in which case they would continue to own those Notes and, as such, would continue to be owed interest as it comes due.

After the close of discovery, the parties elected to bypass summary judgment and instead to adjudicate that claim through a bench trial on the papers.  Evidence, they proposed, would be presented through affidavits, deposition designations, stipulations, and other exhibits, and legal arguments would be advanced through written briefing and oral summations.  Dkt. 80.  The Court then accepted that proposal.  Dkt. 81.  On July 1, 2022, the parties submitted exhibits, *see* Dkt. 83; objections thereto, *see* Dkts. 82-2, 82-3; stipulations, Dkt. 82-1 ("Joint Stipulations"); written briefing, Dkts. 86, 87 ("Deft. Br."); and three sets of proposed findings of fact and conclusions of law, one proposed jointly by the two parties, Dkt. 84 ("Joint Proposed Findings"), and two proposed, respectively, by Plaintiffs, Dkt. 85, and by Defendant, Dkt. 88.[4]  On July 15, 2022, the parties submitted briefing in response to their adversaries' submissions.  Dkts. 91, 92 ("Deft.

---

[4] Plaintiffs' brief and proposed findings of fact and conclusions of law were later amended on September 6, 2022, Dkts. 98 ("Pls. Br."), 99, following their realization that an arithmetical error had led to the inclusion of an incorrect figure in their initial filings.  Dkt. 100.

Resp."). Lastly, the parties presented summations orally on October 19, 2022. *See* Minute Entry dated Oct. 19, 2022.

For reasons that follow, the Court concludes that section 1301 of the Indenture did not authorize the Mandatory Conversion of the Notes and, therefore, that the Mandatory Conversion was invalid. Plaintiffs continue to own the Notes they had purchased, and they are owed interest on those Notes as it comes due. Defendant therefore is liable to Plaintiffs for unpaid interest that has become due on those Notes since the Mandatory Conversion took place, along with pre-judgment interest of 16%, as provided under the Indenture, on the unpaid amounts.

## I.  Findings of Fact

"In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Therefore, the Court first sets forth the following findings of fact. Because the parties disagree primarily about the proper application of section 1301 of the Indenture, not about the underlying events leading up to the 2019 Amendment and the Mandatory Conversion, these findings of fact are drawn largely from the parties' factual stipulations and their Joint Proposed Findings. Additional facts are drawn from the exhibits they have submitted. They have objected to various exhibits and deposition excerpts sought to be introduced in this case; the Court addresses those objections only to the extent that these Findings of Fact draw on the evidence objected to. *See, e.g.*, *Angelo Gordon & Co., L.P. v. Dycom Indus., Inc.*, No. 04 Civ. 1570 (RMB), 2006 WL 870453, at *1 n.1 (S.D.N.Y. Mar. 31, 2006) ("[T]he Court makes those rulings that are material to its determination on the merits.").

Defendant is an Argentine construction company. Joint Proposed Findings ¶ 4. Pursuant to the Original Indenture dated August 3, 2017, Defendant issued the Notes, convertible subordinated debt securities with an aggregate face value of $150 million and a maturity date of

August 3, 2027.  *Id.* ¶ 5.  The Notes paid annual interest of 8% in the year following issuance, 9% in the next year, and 10% in all subsequent years through maturity.  *Id.*  Plaintiffs each purchased Notes on August 3, 2017, the date they were issued:  Tennenbaum purchased Notes with an aggregate face value of $15 million, *id.* ¶ 9, and Merkin purchased Notes with an aggregate face value of $3 million, *id.* ¶ 10.  Under section 1301 of the Original Indenture, owners of the Notes had the right to convert them into Defendant's common stock.  *Id.* ¶ 6.  Section 1301 further authorized a mandatory conversion of the Notes into Defendant's common stock if a particular condition was met—namely, "[i]f [Defendant] proceeds with an initial public offering for its [common stock] (or other equity interests) in the United States on the New York Stock Exchange LLC, the NASDAQ Stock Market LLC or any of their successors in which at least U.S.$100,000,000 of its [common stock] (or other equity interests) are sold by [Defendant]."  *Id.* ¶ 7 (quoting Inden. § 1301).

By early 2019, Defendant was in financial distress, in part because of weakness in the Argentine economy, and in part because the Argentine peso, the currency in which it earned revenue, had depreciated in value compared with the United States dollar, the currency in which its debt was denominated.   Dkt. 83-7 ("Sersale Dep.")[5] at 40:24-41:19, 125:24-126:21.  Consequently, the company and various interested stakeholders sought to "restructure the company's balance sheet in order for the company to survive."  *Id.* at 125:9-15.  The restructuring, which culminated in the Mandatory Conversion, was implemented in steps over the course of 2019 and early 2020.  First, on February 15, 2019, Defendant and "a substantial majority of the holders of" the Notes entered into a recapitalization support agreement and an interest deferral agreement.

---

[5] Francisco Sersale was appointed to Defendant's Board of Directors (the "Board") in April 2019 and served as the Board's President, the equivalent of Chair.  Sersale Dep. 37:6-16; *see also* Joint Proposed Findings ¶ 24.

Dkt. 83-17 at 1.  Then, on August 8, 2019, Defendant and "a substantial majority of the holders of the" Notes entered into the Amended and Restated Recapitalization Support Agreement (the "RSA").  *Id.* at 1-2; *see* Dkt. 83-16 ("RSA").  In the RSA, Defendant and a number of its leading investors agreed that Defendant would issue new preferred stock, which would be either sold for fresh capital or exchanged for existing liabilities such as the Notes.  Dkt. 83-17 at 2.  Defendant would thereby "obtain a significant reduction in financial liabilities in foreign currency" and would rebuild its capital, which could then be used to support its business activities.  *Id.* at 1; *see* RSA at 1-2 (listing the planned transactions).  Plaintiffs did not sign the RSA.  Dkt. 83-8 ("Tennenbaum Decl.") ¶ 27; Dkt. 83-9 ("Barnavon Decl.") ¶ 15.[6]

Defendant then carried out the transactions contemplated in the RSA.  First, Defendant carried out the 2019 Amendment to the Original Indenture.  On November 1, 2019, Defendant's Board proposed amending the Original Indenture and called a meeting of holders of the Notes (the "Noteholders"), scheduled for November 22, 2019, for the purpose of voting on the proposed amendments.  Joint Proposed Findings ¶¶ 15-16.  At that meeting, a majority of the Noteholders approved the proposed amendments.  *Id.* ¶ 17.  Those amendments were then incorporated into the Second Supplemental Indenture, which was dated December 4, 2019.  *Id.*; *see* Second Supp. Inden.  Relevant here was an amendment to section 1301 of the Original Indenture, the provision

---

[6] Defendant objects to a number of paragraphs of both the Tennebaum Declaration, which was sworn by Michael E. Tennenbaum, the settlor of Plaintiff Tennenbaum, Tennenbaum Decl. ¶ 1, and the Barnavon Declaration, which was sworn by Erez Barnavon, a financial and investment advisor to Plaintiff Merkin, Barnavon Decl. ¶ 1.  The objections targeting the paragraphs cited in the text are "on the basis of inadmissible hearsay and on relevancy grounds."  Dkt. 82-3 at 3.  The Court overrules those objections with respect to paragraph 27 of the Tennenbaum Declaration and paragraph 15 of the Barnavon Declaration.  Each paragraph contains a statement asserted to prove its own truth, not a description of a statement made at some other time, so neither is hearsay.  *See* Fed. R. Evid. 801(c)(2).  Furthermore, the Court finds each statement relevant as background that is helpful to understanding Defendant's recapitalization.

governing the mandatory conversion of the Notes into Defendant's common stock.  Joint Proposed

Findings ¶ 18; *see* Second Supp. Inden. § 2.02(l).  As amended by the Second Supplemental

Indenture, section 1301 of the Indenture provides:

> If the Company proceeds with one or more public offerings, whether related or
> unrelated, for its Common Shares (and/or other equity interests) in (i) the United
> States on the New York Stock Exchange LLC, the NASDAQ Stock Market LLC
> or any of their successors and/or (ii) Argentina on the BYMA, in which,
> cumulatively and in the aggregate for such offerings, at least U.S.$100,000,000 of
> its Common Shares (and/or other equity interests) are sold by the Company (the
> "Qualified Public Offering Threshold"), all Securities shall be, on the date on which
> the Qualified Public Offering Threshold is achieved and consummated,
> automatically converted into publicly-tradeable Common Shares registered with
> the Commission and/or the CNV (which, at the option of the Holder, may be
> deposited for delivery of ADSs) at the Conversion Price, adjusted to (and including
> as to any Shares issued as of) the date of the achievement and consummation of the
> Qualified Public Offering Threshold (as determined in good faith by the Board of
> Directors, whose determination shall be conclusive absent manifest error and
> described in a Board Resolution).[7]

Second Supp. Inden. § 2.02(l) (underlining omitted).

In addition to implementing the 2019 Amendment to the Indenture, Defendant issued two

new classes of preferred equity.  First, via a subscription notice released on November 12, 2019,

---

[7] Because the proper interpretation of this provision is the core dispute between the parties,
the Court has omitted alterations clarifying the meaning of defined terms and instead defines those
terms in this footnote.  The "Company" is defined in the preamble to the Indenture as "TGLT
S.A."  Inden. at 1; *see also id.* § 101(D), at 5 (defining "Company" to have the meaning given in
the preamble to the Indenture, with further details not relevant here).  "Common Shares" are
defined as "the common shares of the Company" (with additional details and provisos not relevant
here).  *Id.* § 101(D), at 5.  The "BYMA" is defined as "the Buenos Aires Stock Exchange (*Bolsas
y Mercados Argentinos S.A.*)."  *Id.* § 101(D), at 4.  The "Commission" is defined as "the U.S.
Securities and Exchange Commission" (with additional details not relevant here).  *Id.* § 101(D), at
4-5.  The "CNV" is defined in the recitals preceding the Indenture as "the Argentine *Comisión
Nacional de Valores*."  *Id.* at 1; *see also id.* § 101(D), at 4 (defining "CNV" to have the meaning
specified in the recitals preceding the Indenture).  The "Conversion Price" is defined as "[t]he price
at which Common Shares (including Common Shares represented by ADSs) shall be delivered
upon conversion."  *Id.* § 1301; *see also id.* § 101(D), at 5 (defining "Conversion Price" to have the
meaning specified in section 1301).  The "Board of Directors" is defined as "the board of directors
of the Company."  *Id.* § 101(D), at 4.  A "Board Resolution" is defined as "a copy of a resolution
passed by the Board of Directors" (with further details not relevant here).  *Id.*

Defendant announced that it would conduct an offering (the "Class A Offering") of Class A Preferred Shares and American depositary shares representing shares of Class A Preferred Shares (together, "Class A Shares").   Joint Proposed Findings ¶ 12; *see also* Dkt. 83-25, 83-26 ("Subscription Notice").   Class A Shares could be purchased for cash or for certain in-kind contributions.   Joint Proposed Findings ¶ 12.   On December 11, 2019, Defendant issued 39,033,842 Class A Shares, *id.* ¶ 19, in exchange for approximately $15 million[8] USD in cash and for real estate worth approximately $24 million USD, *id.* ¶ 20.   Under the terms of the Class A Offering, upon satisfaction of the Qualified Public Offering Threshold, the condition required under section 1301 of the Indenture for the mandatory conversion of the Notes into equity, shares of Class A stock would be mandatorily converted to Defendant's common stock at a rate of approximately nine shares of common stock per one Class A Share.  *See* RSA, Exh. A at 2 (defining the liquidation preference of Class A Shares), 4 (defining the conversion rights of Class A Shares with liquidation preference of $1.00 USD); *see also* Sersale Dep. at 258:9-15.

Second, Defendant announced via both the same Subscription Notice and via an exchange notice that it would conduct an offering (the "Class B Offering", and, together with the Class A Offering, the "Offerings") of Class B Preferred Shares and American depositary shares representing shares of Class B Preferred Shares (together, "Class B Shares", and together with Class A Shares, the "Shares").  Joint Proposed Findings ¶ 13.  In the Class B Offering, investors could tender Defendant's common stock, the Notes, or entitlements to deferred interest in exchange for Class B Shares.  *Id.*; Sersale Dep. at 156:15-157:18.  In addition, although Class B Shares were not offered to the public in the United States, the Class B Offering was extended on a

---

[8] This figure appears to be the sum of $14.1 million in cash and $1 million in a private corporate bond.  Dkt. 83-41 ("Presentation") at 4.

private basis to American investors through an offering memorandum dated November 4, 2019. Joint Proposed Findings ¶ 14. Similarly, under that offering memorandum investors could acquire Class B Shares in exchange for Defendant's common stock, the Notes, or entitlements to deferred interest. *Id.* On December 11, 2019, Defendant issued 140,796,732 Class B Shares. *Id.* ¶ 21. In exchange, it received approximately 500,000 American depositary shares representing Defendant's common stock, Notes with a face value of approximately $128 million USD,[9] and entitlements to approximately $11 million USD of deferred interest.[10] *Id.* In the Class B Offering, Noteholders received Class B Shares at a rate of one Class B Share for every $1 USD in face value of Notes exchanged. Dkt. 82-29 ("Exchange Notice") at 1-2. As with Class A Shares, Class B Shares would be mandatorily converted to Defendant's common stock upon satisfaction of the Qualified Public Offering Threshold under section 1301 of the Indenture, but at a lower rate of approximately three shares of common stock for one Class B Share. RSA, Exh. A at 2-3 (defining the liquidation preference of Class B Shares), 4-5 (defining the conversion rights of Class B Shares with liquidation preference of $1.00 USD); *see also* Sersale Dep. at 258:9-15. Plaintiffs did not

---

[9] This $128 figure appears to be the sum of approximately $124 million in principal due and $4 million in accrued interest due. *See* Presentation at 4 & n.3.

[10] One item of evidence in the record—a notation in the Presentation delivered to the Board at the February 10, 2020 meeting before the Board voted that the Qualified Public Offering Threshold was met—appears to suggest that the consideration received in exchange for Class B Shares included approximately $100,000 in cash. Presentation at 3. However, other evidence indicates that no cash was received in exchange for Class B Shares, including both the Presentation's own description of the results of the Class B Offering, *see id.* at 2, and the testimony of Sersale, the President of the Board, *see* Sersale Dep. at 157:4-11. In light of this ambiguous evidence, the Court sees no reason to disturb the finding of fact, proposed by Defendant itself jointly with Plaintiffs, that the consideration received in exchange for Class B Shares did not include cash. *See* Joint Proposed Findings ¶ 21. And in any event, the Court concludes that the margin by which the Qualified Public Offering Threshold was not met was considerably greater than $100,000. *See infra* II.D.

participate in the Class B Offering and did not exchange any of the Notes they owned for Class B

Shares.  Tennenbaum Decl. ¶ 28; Barnavon Decl. ¶ 16.[11]

Lastly, once it had amended the Original Indenture and conducted the Offerings, Defendant

carried out the Mandatory Conversion.  On February 10, 2020, the Board met and considered

whether the Qualified Public Offering Threshold had been met, thereby triggering a mandatory

conversion of the Notes and the Shares into common stock.  Joint Proposed Findings ¶¶ 22-23.  At

that meeting, the Board reviewed documents prepared by Defendant's legal and financial advisors,

*id.* ¶¶ 25-31, and on that basis voted unanimously that the Qualified Public Offering Threshold

had been satisfied by the Offerings, *id.* ¶ 32.  That day, Defendant issued a public letter announcing

similarly that the "total amount of the securities representing the Company's capital stock issued

cumulatively under the [Offerings] . . . exceeded the aggregate principal amount of US$

100,000,000" and therefore that

> the Board of Directors of the Company has determined that the Qualified Public
> Offering Threshold has been met, resulting in the mandatory conversion, with
> immediate effect as of the date hereof, of (a) the Convertible Subordinated Notes
> due 2027, issued by the Company on August 3, 2017 (the "Convertible Notes"),
> pursuant to the provisions of Section 1301, last paragraph, of the indenture of the
> Convertible Notes (as amended from time to time, the "Indenture"); and (b) the
> Preferred Shares, pursuant to Section 12(b) of their respective terms and conditions
> approved by the shareholders' meeting held on September 10, 2019.

Dkt. 83-44 at 1.  Defendant subsequently ceased making interest payments on the Notes to

Plaintiffs.  *See* Tennenbaum Decl. ¶ 39; Barnavon Decl. ¶ 25.

## II.  Conclusions of Law

As mentioned, following the Court's decision on Defendant's motion to dismiss, Plaintiffs'

sole remaining argument for the unlawfulness of the Mandatory Conversion is that the condition

---

[11] Defendant similarly objects to these paragraphs of the Tennenbaum and Barnavon
Declarations, and for similar reasons the Court overrules those objections.  *See supra* note 6.

required by section 1301 of the Indenture for a mandatory conversion to be authorized—namely, the satisfaction of the Qualified Public Offering Threshold—was not met.  For the following reasons, the Court concludes that the Board manifestly erred in determining that the Qualified Public Offering Threshold was met, that the Threshold was not in fact met, and, therefore, that under the Indenture the Notes were not mandatorily converted to Defendant's common stock on February 10, 2020.

A.      **The Scope of Manifest Error**

The parties' disagreement largely boils down to a single sentence found within section 1301 of the Indenture, the section that governs when the Notes would be mandatorily converted to Defendant's common shares.  That sentence contains two parts relevant to the lawfulness of the Mandatory Conversion.  First, it defines the Qualified Public Offering Threshold, the condition that triggers the mandatory conversion of the Notes into equity.  As mentioned, the Qualified Public Offering Threshold is met if

> the Company proceeds with one or more public offerings, whether related or unrelated, for its Common Shares (and/or other equity interests) in (i) the United States on the New York Stock Exchange LLC, the NASDAQ Stock Market LLC or any of their successors and/or (ii) Argentina on the BYMA, in which, cumulatively and in the aggregate for such offerings, at least U.S.$100,000,000 of its Common Shares (and/or other equity interests) are sold by the Company . . . .

Second Supp. Inden. § 2(l).  Second, it specifies the role that the Board must play in a mandatory conversion.  In particular, the relevant clause provides that

> all Securities shall be, on the date on which the Qualified Public Offering Threshold is achieved and consummated, automatically converted into publicly-tradeable Common Shares registered with the Commission and/or the CNV (which, at the option of the Holder, may be deposited for delivery of ADSs) at the Conversion Price, adjusted to (and including as to any Shares issued as of) the date of the achievement and consummation of the Qualified Public Offering Threshold (as determined in good faith by the Board of Directors, whose determination shall be conclusive absent manifest error and described in a Board Resolution).

*Id.*

11

As a preliminary matter, the parties disagree about how the final parenthetical of this clause—that is, "(as determined in good faith by the Board of Directors, whose determination shall be conclusive absent manifest error and described in a Board Resolution)"—affects the Court's role in adjudicating Plaintiffs' claims.  Plaintiffs argue that the parenthetical applies only to the immediately preceding noun phrase in the sentence—namely, the phrase "the Conversion Price, adjusted to (and including as to any Shares issued as of) the date of the achievement and consummation of the Qualified Public Offering Threshold."  Pls. Br. at 12.  Thus, Plaintiffs argue that the Board's determination is conclusive absent manifest error only as to the appropriate adjustment that must be made to the Conversion Price, a complex process governed by section 1304 of the Indenture.  *See id*. at 12-13; *see also* Inden. § 1304.  Otherwise, Plaintiffs maintain, section 1301 does not afford any heightened deference to the Board's determination of whether the Qualified Public Offering Threshold is met.  Pls. Br. at 12-13.  By contrast, Defendant argues that the parenthetical applies more broadly, such that the Board's determination is conclusive absent manifest error both as to whether the Qualified Public Offering Threshold has been met and as to how the Conversion Price must be adjusted in a mandatory conversion.  Deft. Resp. at 1-7.  Like Plaintiffs, Defendant argues that its reading better fits the text of section 1301.  *Id*. at 6-7.  Regardless of which interpretation is more compelling, however, Defendant also argues that its preferred reading is now the law of the case, since it was not disputed by Plaintiffs at earlier stages of this litigation and since the Court presupposed it in its prior decisions.  *Id.* at 5-6; *see Tennenbaum Living Tr.*, 2021 WL 3863117, at *8-10.

While each party offers compelling arguments in support of its position, the Court will ultimately conclude that the Board not only erred but further erred manifestly in determining that the Qualified Public Offering Threshold had been met, and thus that Plaintiffs would prevail

regardless of the scope of the manifest error parenthetical in section 1301. In the remainder of these Findings of Fact and Conclusions of Law, then, the Court will assume, *arguendo*, that Defendant is correct as to the scope of the manifest error parenthetical.

## B.  The Meaning of Manifest Error

If the Board's determination that the Qualified Public Offering Threshold had been met is conclusive absent manifest error, then to prevail in their claims that the Mandatory Conversion was not authorized by section 1301, Plaintiffs must show not only that the Qualified Public Offering Threshold was not met but further that the Board's contrary determination was not merely erroneous, but manifestly erroneous, and thus not conclusive. Whether Plaintiffs can make that showing, in turn, depends on what separates mere errors from manifest ones. Thus, the Court first sets out its interpretation of the manifest error standard. For three reasons, the Court concludes that whether or not an error is manifest depends on the type of information required to demonstrate that the error was made. If the examination of extrinsic factual evidence is required to demonstrate the existence of an error in another's decision, then that error is not manifest. Instead, an error is manifest if it may be identified without any additional, extrinsic factual evidence.

First, this interpretation of the manifest error standard is consistent with how New York law generally understands contractual provisions requiring a court to defer to a determination that some condition has been satisfied absent manifest error.[12] Neither the Court nor the parties have identified any recent New York Court of Appeals decision interpreting "manifest error" in this context. But the Appellate Division has addressed the issue in recent years—albeit rarely—and has relied on the definition of manifest error provided by the Court of Appeals almost a century

---

[12] Other than certain provisions not relevant here, the Indenture is governed by New York law. Inden. § 112.

and a half ago in *In re Hermance v. Board of Supervisors*, 71 N.Y. 481 (1877), *see Sempra Energy Trading Corp. v. BP Prods. N. Am.*, 860 N.Y.S.2d 71, 72 (App. Div. 2008) (citing *Hermance)*; *Structured Credit Partners, LLC v. PaineWebber Inc.*, 306 A.D.2d 132, 132 (App. Div. 2003) (same); *see also Rogers Revocable Tr. U/A/D 12/31/81 v. Bank of Am., N.A.*, 64 A.D.3d 401, 402 (App. Div. 2009) (citing *Structured Credit Partners*), as have some New York trial courts, *see Rogers Revocable Tr. v. Bank of Am., N.A.*, No. 601133/2004, 2008 N.Y. Misc. LEXIS 7471, at *13 (N.Y. Sup. Ct. 2008) (citing *Hermance* and *Structured Credit Partners*); *see also Curacao Oil N.V. v. Trafigura Pte. Ltd.*, No. 651746/2019, 2020 WL 3494685, at *6 (N.Y. Sup. Ct. 2020) (citing *Sempra Energy Trading*).   Thus, although *Hermance* was not itself decided recently, New York courts continue to recognize it as providing the definition of manifest error employed under New York law when interpreting contracts containing manifest error provisions.

*Hermance* did not itself address a contract; rather, it interpreted a statutory provision authorizing county boards of supervisors "to correct any manifest, clerical, or other error" in the tax assessments performed by town officers.  71 N.Y. at 485 (quoting 1869 N.Y. Laws chap. 855 § 5).   As the Court of Appeals explained, "'manifest,' as used here, means something which is apparent by an examination of the assessment-roll or return, needing no evidence to make it more clear."  *Id.* at 486.   The word "is synonymous with evident, visible, plain, obvious to the understanding from an examination of the roll or document; or, at the most, only requiring a mathematical calculation to demonstrate it."  *Id.*  Furthermore, manifest errors are "not errors which may be shown to have been committed by extrinsic evidence or may be proved to the satisfaction of the court" or which result from "any inquiry, the production of proofs, or any trial."  *Id.* at 485-86.   These explications of the meaning of "manifest" distinguish manifest errors from other errors in terms of what information must be reviewed in order to identify the error.  If an

14

error can be identified only after "an inquiry, the production of proofs, or any trial," or if "extrinsic evidence" is required to identify the error, then it is not manifest.  *Id.*  However, an error is manifest if it may be identified merely by reviewing the allegedly erroneous decision, without considering any extrinsic information.  So, where a tax assessment is memorialized in an assessment roll or tax return, an error in that assessment is manifest if it "apparent by an examination of the assessment-roll or return" such that "no evidence" outside the roll or return is needed to perceive the error.  In general, then, an error is manifest when no evidence extrinsic to the decision is needed to perceive that an error was made.  Applied to this case, the Board's determination that the Qualified Public Offering Threshold had been met would be manifestly erroneous if an error can be identified based only on an examination of the Board's decision, namely the materials the Board considered and the determination it reached on that basis, without additionally considering any evidence that pertains to the underlying question of whether the Threshold actually had been met.[13]

Second, this interpretation of "manifest" accords with the ordinary meaning of the term. Merriam-Webster defines "manifest" as "readily perceived by the senses and especially by the sense of sight."  *Manifest*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ manifest (last accessed July 15, 2023).  This definition centers on the method by which an individual acquires information—in particular, a fact is manifest if it can be learned through immediate sensory perception rather than requiring an active form of inquiry, such as deductive or inductive reasoning.  Similarly, the Oxford English Dictionary defines "manifest" as "[c]learly revealed to the eye, mind, or judgment; open to view or comprehension; obvious."  *Manifest*, Oxford English Dictionary, https://www.oed.com/view/Entry/113483 (last accessed July 15,

---

[13] As discussed *infra*, if the Board's determination was in fact manifestly erroneous, the Court itself then considers the underlying question of whether the Qualified Public Offering Threshold had been met, freed from the evidentiary constraints of the manifest error standard.

2023).   Again, this definition centers on how information comes to be learned: information is manifest when it is "clearly revealed" or "open to view or comprehension" rather than being hidden.  Thus, as with the definition set forth by the Court of Appeals in *Hermance*, the ordinary meaning of "manifest" distinguishes facts that are immediately perceptible from those identifiable only through active inquiry.  Employing the term's ordinary meaning, then, an error in the Board's decision would be manifest when it is readily perceptible simply from examining the decision itself, rather than requiring any further investigation or inquiry.

Lastly, this interpretation of "manifest" advances the function that manifest error clauses plausibly serve in the contracts that employ them.  A manifest error clause typically requires a court adjudicating a contract dispute to defer to some specific individual or entity as to whether a certain condition is met.  Ordinarily, such clauses are employed when determining whether the condition is met involves a complex, factual question requiring detailed investigation and specialized, technical expertise.  For example, New York courts have recently heard suits concerning contracts that apply manifest error clauses to technical financial assessments, *see*, *e.g.*, *Destiny USA Holdings, LLC v. Citigroup Glob. Mkts. Realty Corp.*, 889 N.Y.S.2d 793, 799 (App. Div. 2009) (quoting a manifest error clause applied to a construction lender's estimate of whether the remaining construction costs exceeded the undrawn balance of the loan); *Rogers Revocable Tr.*, 64 A.D.3d at 402 (finding that "[t]he calculation of the postmerger adjustment was not manifest error"); *Structured Credit Partners*, 306 A.D.2d at 132 (appealing to "the provisions in the parties' agreements that defendant's arbitrage profit calculations 'shall be binding and final absent manifest error'"); *MBIA Ins. Corp. v. Royal Bank of Canada*, No. 12238/09, 2010 WL 3294302, at *11 (N.Y. Sup. Ct. 2010) ("Deutsche Bank's determination [that a credit event occurred] was binding on the parties absent manifest error."), or to the appraisal of a commodity's

quality, *see, e.g.*, *Sempra Energy Trading Corp.*, 860 N.Y.S.2d at 72 ("[T]he parties agreed that the quality and quantity of the fuel would be determined and certified prior to discharge by a mutually acceptable inspector, and that the pre-discharge report was binding on the parties except in the event of fraud or manifest error."); *Lion Copolymer, LLC v. Kolmar Ams., Inc.*, 47 N.Y.S.3d 309, 310 (App. Div. 2017) (discussing "whether the butadiene testing in the Netherlands contained manifest errors"); *Curacao Oil*, 2020 WL 3494685, at *1-2 (describing a contract under which an independent inspector's determination as to the quality of fuel oil would be final and binding absent fraud or manifest error).

Absent a manifest error clause, a court hearing a challenge to such a contractual provision would be required to independently determine whether the condition established by that provision had been met. Judges, then, might be required themselves to compute a financial assessment or to evaluate the quality of the relevant commodity, likely based on the competing testimony of expert witnesses hired by each side. It is understandable why sophisticated contractual parties would not want to resolve disputes through such a process: few judges are trained as financial professionals or commodity inspectors, and thus there is reason for concern that they would compute financial quantities or assess commodity quality incorrectly. A manifest error clause avoids such outcomes by requiring courts not to make such determinations themselves but rather to defer to qualified experts selected by the parties. Nonetheless, while this argument does suggest why the parties might prefer for the court to defer to an expert's determination as to whether some complex factual condition has been satisfied, it does not apply to the threshold question of whether the appointed expert has, in fact, investigated the question assigned to the expert by the contract. A court may not be able to correctly perform some complex financial calculation or measure the quality of fuel oil itself, but it can more easily identify whether an expert has performed a different calculation or

evaluated the wrong oil. Thus, for manifest error clauses to properly serve their function, they must preclude courts from reexamining the substantive correctness of the determination to which the clause applies, but they need not require deference when the basis for challenging that determination consists not in a substantive disagreement with its result but rather in the claim that the decisionmaker violated the contractual provisions governing his or her delegated authority.

This Court's interpretation of "manifest error" achieves these goals. The sorts of substantive disputes that courts are unqualified to adjudicate are precisely those in which each side presents extrinsic evidence in favor of its position—where, for example, each party to a suit over financial valuation develops its own valuation model for the relevant asset, or where each party to a suit over commodity quality conducts its own testing on the relevant commodity. By preventing courts from relying on such extrinsic evidence to overturn the determination made conclusive by the contract, a manifest error clause ensures that judges will not themselves attempt to conduct complex factual investigations they are unqualified to resolve. But because a manifest error clause, on this Court's interpretation, permits courts to overturn that determination if an error may be identified merely by examining how that determination was made, without examining any other evidence, such clauses still permit courts to enforce the terms under which the contract delegates decision-making authority. This analysis of the function served by manifest error clauses would not control were it in conflict with the contractual language or with binding New York precedent.[14] But because no such conflict exists, the function of such clauses further supports this Court's

---

[14] To that end, the Court notes that outside of section 1301, the Indenture employs the manifest error standard only to technical financial calculations. *See* Inden. § 107 ("Calculations in Respect of Securities."). The phrase "manifest error" is also used in one other provision, but because that provision does not employ the phrase to identify the standard by which a court must review some determination made by the Board or by Defendant, the Court views that provision as less relevant to the proper interpretation of section 1301. *See id.* § 901(5).

interpretation of "manifest error" to designate errors that may be identified by reviewing the challenged determination on its own, without considering any extrinsic evidence.

## C.      The Board's Determination

As mentioned, on February 10, 2020, the Board determined that the Qualified Public Offering Threshold had been met and, on that basis, carried out the Mandatory Conversion of the Notes.  Plaintiffs argue that the Board's determination was erroneous for three reasons:  first, because the Second Supplemental Indenture did not come into effect until December 11, 2019 and was not retroactive, the Original Indenture, without the 2019 Amendment, should have governed the Board's determination, Pls. Br. at 14-16; second, because the bulk of the Shares were sold not in a public offering, such as the Class A Offering or the Class B Offering, but rather in the RSA, which was not a public offering, *id.* at 16-17; and third, because Defendant did not sell $100 million of its equity interests, collectively, in the Offerings, *id.* at 17-24.  Each of these errors, Plaintiffs further argue, was manifest.  *Id.* at 14, 16-17.

As the Court has held, for the Board to have erred manifestly in determining that the Qualified Public Offering Threshold was met, its error must be apparent on the face of its decision rather than identifiable only upon consideration of extrinsic evidence.  In evaluating Plaintiffs' arguments, then, the Court will not consider extrinsic evidence but instead will review only the Indenture itself, which defined the question the Board was required to answer, and the materials consulted by the Board in answering that question.  Employing only that basis, the Court concludes that the Board erred in determining that Defendant sold $100 million of its equity interests in the Offerings and therefore that the Qualified Public Offering Threshold was met.[15]   Furthermore,

---

[15] Having so concluded, the Court need not consider Plaintiffs' arguments that the Second Supplemental Indenture was improperly applied retroactively and that the Shares were not sold in a public offering.

because the Court reviews only the Board's decision itself and does not consider any extrinsic evidence that the Board did not rely on, the error identified in that review is manifest. Accordingly, the Board's determination is not conclusive under section 1301 of the Indenture.

Pursuant to section 1301, as amended, the Qualified Public Offering Threshold is met if Defendant proceeds in the United States or Argentina with a public offering or public offerings of its equity interests "in which, cumulatively and in the aggregate for such offerings, at least U.S.$100,000,000 of its Common Shares (and/or other equity interests) are sold by" Defendant. Second Supp. Inden. § 2.02(l). Crucially, in this phrase the "at least U.S.$100,000,000" value must be *of its Common Shares (and/or other equity interests)*." Second Supp. Inden. § 2.02(l) (emphasis added). That is, whether the Qualified Public Offering Threshold was satisfied depends on whether *the equity sold* was "at least U.S.$100,000,000," not on whether any other financial or accounting quantity was equal to or greater than $100,000,000. To satisfy the Threshold, Defendant must have sold "at least U.S.$100,000,000" of its equity interests in one or more public offerings, and the Board determined that the Class A Offering and Class B Offering together met the Threshold, Sersale Dep. at 239:14-240:22; *see also* Joint Proposed Findings ¶ 33. The question of whether Defendant satisfied the Threshold therefore becomes the question of whether the value of the Shares Defendant sold in the Offerings was at least $100 million. As the Court will explain, however, in determining that the Qualified Public Offering Threshold was met, the Board did not attempt to measure the dollar value of the Shares sold in the Offerings but instead measured the dollar value of other aspects of the Offerings—aspects that the plain language of section 1301 of the Indenture does not employ to define the Qualified Public Offering Threshold. Because the Board determined that the Qualified Public Offering Threshold was met not by determining whether the dollar amount of Shares sold in the Offerings was at least $100 million—as required

by section 1301—but rather by considering whether the dollar amount of various other aspects of the Offerings was at least $100 million—which is not the standard enshrined in section 1301—the Board's determination was manifestly erroneous.

### 1.  Change in Shareholders' Equity

According to Defendant, the Board's determination that it sold "at least U.S.$100,000,000 of its [equity]" in the Offerings depended primarily on the impact of the Offerings on Defendant's balance sheet.  Defendant argued at trial:  "There could be many, many ways to look at the question of was $100 million sold?  The board chose to look at it through the vantage point of the impact on the balance sheet, and with respect to the impact on the balance sheet, it was unquestionably greater than $100 million."  Dkt. 110 ("10/19/22 Tr.") at 59:18-22; *see also id.* at 38:7-9 ("The board looked at, [w]ell, what is the impact on the balance sheet of [Defendant]?").  That balance sheet impact is detailed in the Presentation that was delivered to the Board at their February 10, 2020 meeting before they voted on whether the Qualified Public Offering Threshold had been met. *See* Presentation; *see also* Sersale Dep. at 274:11-18 (identifying the exhibit that is the Presentation as having been delivered to the Board on February 10, 2020); Dkt. 82-3 at 5 (locating exhibit in the record).   The Presentation provided data showing that Defendant's shareholders' equity increased by over $100 million as a result of the Offerings.  Presentation at 4 ("With the issuance of the new preferred stock, shareholders' equity (on a pro forma basis) goes from negative USD 53.2 to positive USD 78.9, representing an increase of more than USD 130M.").  Shareholders' equity (or stockholders' equity) is the "ownership interest of stockholders in the corporation."  Joel G. Siegel & Jae K. Shim, *Dictionary of Accounting Terms* 420 (3d ed. 2000).  That is, it represents the residual value of the corporation—the portion of its value that remains to be claimed by its owners, the shareholders, once the amounts owed to third parties have been paid.  It is computed by subtracting the corporation's liabilities—roughly, what it owes to others, *id.* at 257—from its

assets—roughly, what it owns, *id.* at 30.  *See id.* at 420 ("Stockholders' equity is the difference between total assets less total liabilities.").  A corporation's shareholders' equity is therefore a mathematical function of its assets and liabilities, and changes in a corporation's shareholders' equity may be computed based on changes in its assets and liabilities.

The Presentation discloses no error in the Board's computation of how the Offerings increased Defendant's shareholders' equity.  It separately itemizes aspects of the Offerings that affected Defendant's assets or liabilities and, therefore, that affected its shareholders' equity as a matter of mathematical necessity.  Presentation at 4.  Some line items pertain to the Class A Offering.  As mentioned, participants in the Class A Offering could purchase Class A shares in exchange for cash or other forms of property, Joint Proposed Findings ¶ 12, and in the Class A Offering approximately 39 million Class A Shares were purchased in exchange for approximately $14 million in cash, $1 million in a private corporate bond, and $24 million in real estate, Presentation at 4; *see also* Joint Proposed Findings ¶ 20.  Because the cash, corporate bond, and real estate constituted assets of Defendant once they were acquired in exchange for Class A Shares, Defendant's shareholders' equity increased by a corresponding amount once Defendant took ownership.   Presentation   at   4   (line   items   "Equity   contribution │ Cash,"   "Equity contribution │ Private Corporate Bond," and "Equity contribution │ Hudson land").

The remaining line items pertain to the Class B Offering.  First, the Class B Offering involved the exchange of Class B Shares for Notes with a principal amount due of $124.3 million. *Id.* at 4 n.1.  Ordinarily, such cancellation of debt securities would reduce Defendant's liabilities by $124.3 million, and would thereby increase its shareholders' equity by the same amount.  *Id.* at 4 (line item "Convertible Notes │ Capitalization of principal").  However, because a convertible note grants its owner the right to convert the note into a share of common stock, it is not a pure

debt instrument but is instead a hybrid of debt and equity.  Jeffrey J. Haas, *Corporate Finance* § 46(A) (2d ed. 2021).  To reflect that hybrid character, when the Notes were issued they were not recorded solely as liabilities on Defendant's balance sheet but were instead recorded in part as liabilities and in part as shareholders' equity.  Presentation at 4 n.2 ("Approximately one third of total Convertible Notes was recorded in [Defendant]'s balance sheet as shareholders' equity at the time of the issuance.").  Thus, a portion of the Notes that were exchanged in the Class B Offering had already been recorded as shareholders' equity rather than as liabilities on Defendant's balance sheet; because those Notes had not been recorded as liabilities, cancelling them did not reduce Defendant's liabilities.  Therefore, although Notes with a principal amount of $124.3 million were exchanged in the Class B Offering, $43.4 million of that amount—*i.e.*, approximately one-third of the Notes—neither reduced Defendant's liabilities nor increased its shareholders' equity when cancelled.  *Id.* (line item "(-) Convertible Notes | Equity credit").[16]

Next, two coupons due on the Notes in February 2019 and August 2019, in the total amount of $11 million, had been deferred and had not been paid by December 2019.  *Id.* at 4 n.3.  In the Class B Offering, Noteholders could receive Class B Shares in exchange for entitlements to those deferred payments of interest, as well as for entitlements to interest that had accrued between August 2019 and December 2019, which amounted to $4 million.  *Id.* ("These two coupons (totaling USD 11M), jointly with the accrued interests from August to December 2019 for USD 4M, were also capitalized.").  Because interest owed is a liability, the cancellation of those entitlements to interest decreased Defendant's liabilities by $15 million, and correspondingly

---

[16] Plaintiffs advance a different interpretation of this line item as "accounting for [the Class B Shares] at an 'equity value' of only USD $43.4 million."  Pls. Br. at 23.  That interpretation, however, is inconsistent with the Presentation.  If the line were recording the Class B Shares as having an equity value of $43.4 million, it would have had a positive impact on shareholders' equity, but the Presentation values it at negative $43.4 million.  *See* Presentation at 4.

increased its shareholders' equity by the same amount. *Id.* at 4 (line item "Convertible Notes ┃ Capitalization of deferred/accrued interests"). Lastly, the exchange of Notes for Class B Shares affected the accounting treatment of certain tax, foreign exchange, and interest issues, which had a net impact of reducing shareholders' equity by approximately $3 million. *Id.* (line items "Convertible Note ┃ Deferred tax" and "Convertible Notes ┃ Fx differences & Interests"). Together, these changes to assets and liabilities increased shareholders' equity from negative $53.2 million to positive $78.9 million, an increase of over $100 million.[17] *Id.*

But while the Board may have correctly computed that Defendant's shareholders' equity increased by over $100 million, section 1301 of the Indenture does not define the Qualified Public Offering Threshold in terms of the magnitude of an increase in Defendant's shareholders' equity. *See* Second Supp. Inden. § 2.02(l). Rather, the Threshold is defined in terms of the value of the equity interests that Defendant sold. *Id.* And a change in a corporation's shareholders' equity is simply not the same thing as the value of a certain subset of its equity interests. Because shareholders' equity represents the residual portion of a firm's value recoverable by its owners after all claims are paid, a change in shareholders' equity reflects either a change in the firm's overall value or a change in the portion of its value owed to third parties. By contrast, a subset of the corporation's shares represents a partial ownership interest in the corporation, and the value of that partial interest depends on both the total value of the corporation and on how that value is divided amongst the corporation's owners. While a particular class of equity concerns a specific subset of ownership interests in a corporation, shareholders' equity pertains to all its ownership

---

[17] As mentioned, *see supra*, Defendant also received approximately 500,000 American depositary shares representing Defendant's common stock in exchange for Class B Shares. Joint Proposed Findings ¶ 14. However, because that aspect of the Class B Offering merely exchanged one form of equity for another, it did not affect Defendant's assets, liabilities, or net shareholders' equity and thus did not affect the calculations found in the Presentation. *See* Presentation at 4.

interests, taken together.  And while the former represents the value of a particular asset, the latter represents a *change* in value.  In determining that the Qualified Public Offering Threshold was met, however, the Board measured the latter, not the former:  it separately itemized how the Offerings affected Defendant's assets and liabilities—primarily, increasing its assets by approximately $40 million in cash or other property and decreasing its liabilities through the cancellation of approximately $95 million in principal and interest owed on the Notes—which shows how the Offerings changed the total value recoverable by Defendant's owners collectively. And while the Board might conceivably have sought to use Defendant's balance sheet as a basis for valuing the Class B Shares, the evidence before the Court gives no indication that the Board took the steps required to employ that approach:  it did not apply the Qualified Public Offering Threshold by identifying Defendant's actual total value then appropriately allocating that total value between the Shares and other classes of equity.

That the Board made no such effort is unsurprising, furthermore, because given the information available to the Board, that approach plainly could not have shown that the Qualified Public Offering Threshold had been met.  Because any change in the value of shareholders' equity affects the resulting value of shareholders' equity following the change, one might reasonably expect that equity interests in a company would be worth at least $100 million following a corporate transaction providing over $100 million of shareholders' equity.  Prior to the Offerings, however, Defendant had negative shareholders' equity:  the value of its liabilities to third parties exceeded the total value of its assets, and thus it lacked sufficient assets to pay all the debts it owed, much less to leave any residual value to its owners.  Consequently, any increases in shareholders' equity, either in the form of increased assets or reduced liabilities, would not initially produce any residual value for Defendant's shareholders but rather would simply enable it to better satisfy the

liabilities it owed to third parties.  Instead, only once its assets became sufficient to fully satisfy its liabilities would further increases in shareholders' equity translate into residual value actually attributable to the owners of its equity.  A $100 million increase in shareholders' equity will not result in shareholders' equity in excess of $100 million if that increase is consumed in satisfying outstanding liabilities to debtholders rather than in creating positive value for shareholders.  Thus, even had the Board valued the Shares sold in the Class B Offering based on the book value recorded on Defendant's balance sheet, the Shares—or any partial ownership stake in Defendant— would have been worth less than $100 million.  As shown in Presentation, following the Offerings the *total* book value of *all* ownership interests in Defendant—that is, the total shareholders' equity—amounted to only approximately $79 million.  *See* Presentation at 4.  Even if the full value of the corporation were attributable to the Shares alone, not to other equity interests in Defendant, the book value of the Shares could not have exceeded the approximately $79 million value of Defendant as a whole.  In sum, because Defendant began with negative shareholders' equity, an increase of over $100 million in book value did not result in either the total shareholders' equity or the shareholders' equity attributable to any subset of Defendant's equity interests, such as the Shares, having a book value of over $100 million.

To be sure, in some equity offerings, such as when a solvent company sells shares for cash at market price, the value of the securities sold does correspond to the increase in shareholders' equity that results from the offering.  First, in such an offering the cash received by the issuer represents the value of the shares sold as judged by the market, inasmuch as the corporation received that cash in exchange for the shares in a fair market transaction.  Second, because such an offering increases the issuer's assets by increasing its cash holdings and does not otherwise affect its assets or liabilities, the value of the cash received also represents the total increase in the

issuer's shareholders' equity that results from the securities offering.  In such circumstances, then, the change in shareholders' equity and the value of the equity sold are typically the same, because the value of the cash received is both equal to the increase in shareholders' equity and presumptively equal to the value of the assets purchased with that cash in a fair market transaction. And it might initially seem that this reasoning could likewise be applied to the Class B Offering, such that the value of the securities issued in that Offering must equal the increase it caused to Defendant's shareholders' equity.  *See, e.g.*, 10/19/22 Tr. at 59:3 (describing the "capitalization change" as a "mirror image" of the sale of equity).

The Class B Offering, however, differed from an offering of equities in exchange for cash: it did not increase Defendant's shareholders' equity by the fair market value of the assets exchanged for shares, as would be true in a sale of equity for cash, but rather increased shareholders' equity by the face value of the debt obligations that were tendered in exchange for the shares.  And the face value of a debt need not equal the value of the consideration exchanged for that debt in a market transaction.  For example, bonds do not typically trade at par value.  *See, e.g.*, John Downes and Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms* 77 (9th ed. 2014).  Market transactions typically involve the exchange of goods of equal market value, such that the market value of the assets Defendant received in exchange for Class B Shares could reasonably indicate the value of those Shares.  But because no particular relationship need exist between the face value of debt obligations and their actual market value, the face value of the Notes tendered in the Class B Offering need bear no particular relationship to the value of the Class B Shares issued in that Offering.  And because the bulk of the increase in shareholders' equity resulting from the Class B Offering depended on the face value of those Notes, that increase

in shareholders' equity is not a "mirror image" of the value of the Class B Shares issued.  *See* 10/19/22 Tr. at 59:3.

Under section 1301 of the Indenture, the value of the Shares sold in the Offerings determines whether the Qualified Public Offering Threshold has been satisfied.  The Board, however, found the Qualified Public Offering Threshold to be satisfied not because the Shares sold were worth more than $100 million but rather because of how the Offerings changed Defendant's shareholders' equity.  Those are different questions, however:  in Defendant's circumstances, at least, a change in shareholders' equity need not correspond to the value of the equity interests that have been issued.  The Board simply focused on the wrong question.  By determining that the Qualified Public Offering Threshold was met based on the dollar value of the impact of the Offerings on Defendant's shareholder's equity, rather than based on the dollar value of the Shares sold in the Offerings, it failed to apply the standard governing whether the Qualified Public Offering Threshold has been met under section 1301 of the Indenture.  Perhaps, as Defendant argued at trial, "what's important from the company's perspective is that the $124 million in notes comes off the balance sheet.  The value of what was provided in exchange for that $124 million is not directly relevant to the company."  10/19/22 Tr. at 58:11-15; *see also id.* at 54:10-12 ("[T]he impact on the balance sheet of the company . . . was the immediate concern at the time."); Deft. Resp. at 14 n.2 (describing the benefits of Defendant's recapitalization).  But regardless of what primarily concerned Defendant, the Indenture, which governs, requires not $100 million of balance sheet impact but rather "at least U.S.$100,000,000 *of [Defendant's] Common Shares (and/or other equity interests)* [to be] sold by the Company."  By relying on the balance sheet impact of the Offerings rather than the value of the Shares, the Board erred.  Furthermore, the Court identified that error not by consulting extrinsic evidence but rather by assessing whether the Board's actual

decision employed the standard required by section 1301 of the Indenture. Because merely examining that decision suffices to reveal that it did not, the Board's error was manifest.

### 2. Liquidation Preference

While Defendant argued at trial that the Board relied primarily on the Offerings' balance sheet impact in determining that the Offerings satisfied the Qualified Public Offering Threshold, 10/19/22 Tr. at 38:7-9, 59:18-22, the Board also consulted a legal memorandum authored by Defendant's legal advisor, the law firm Davis Polk & Wardwell LLP,[18] that advanced an alternative basis for determining that $100 million of equity had been sold in the Offerings— namely, that the aggregate liquidation preference of the Shares sold in the Offerings exceeded $100 million. Dkt. 83-36 ("DPW Memo") at 6. Defendant argues that the Shares' aggregate liquidation preference also played some role, albeit a lesser one, in justifying the Board's conclusion. 10/19/22 Tr. at 61:2-6; *see also* Deft. Br. at 10; Deft. Resp. at 5. Much like the balance sheet impact caused by the Offerings, however, the liquidation preference of the Shares is also simply not the same thing as the value of the equity that was sold, which is the metric actually employed by section 1301 of the Indenture to define the Qualified Public Offering Threshold. Consequently, to the extent that the Board additionally relied on liquidation preference in determining that the Qualified Public Offering Threshold was met, it also manifestly erred.[19]

---

[18] Plaintiffs object to the introduction of the DPW Memo into evidence for purposes other than identifying what the Board considered in determining that the Qualified Public Offering Threshold had been met, *see* Dkt. 82-3 at 5, and the Court relies on it only for that purpose.

[19] The DPW Memo cites a second alternative bases for concluding that the Qualified Public Offering Threshold had been met—that "the cash price per share of each class of the preferred stock was U.S.$1.00 per share," for an aggregate cash price of "approximately U.S.$180 million on the basis of the number of shares issued under the Offers." DPW Memo at 6. However, Defendant has not relied on this second basis either in its briefing before trial or in its oral summation before the Court. *See generally* Deft. Br.; Deft. Resp.; 10/19/22 Tr. Consequently, the Court will not consider whether the Board manifestly erred by determining that the Qualified

Shareholders' equity, the primary basis for the Board's determination that the Qualified

Public Offering Threshold had been met, is a property of a corporation as a whole, not a property

of any individual share or class of shares.  By contrast, liquidation preference is a property of the

individual Class A Shares and Class B Shares.  Furthermore, 39,033,842 Class A Shares were sold

in the Class A Offering, Joint Proposed Findings ¶ 19, and 140,796,732 Class B Shares were sold

in the Class B Offering, *id.* ¶ 21, and since Class A Shares and Class B Shares each had a

liquidation preference of U.S. $1 per share, the aggregate liquidation preference of all the shares

sold in the Offerings was approximately U.S. $180 million, a sum indeed greater than $100 million.

Dkt. 83-24 ("Class B Prospectus") at 9; RSA, Exh. A at 2.[20]  Nonetheless, as with a change in

shareholders' equity, the liquidation preference of a share of preferred stock is simply not the same

thing as its value.

Preferred stock differs from common stock in that preferred stockholders take priority over

common stockholders when the corporation returns capital to its owners:  "In the event of any

voluntary or involuntary liquidation, dissolution or winding up of the company, the company must

pay preferred stockholders their stated . . . *liquidation preference* . . . prior to distributing any assets

---

Public Offering Threshold had been met based on the aggregate cash price for which the Shares were sold.  In any event, it does not appear from the record that Class B Shares were sold for cash in the Class B Offering.  *See* Sersale Dep. at 157:9-11 ("To be able to acquire Class B preferred shares in cash, you would have had to have waited until after the offering was done."); Joint Proposed Findings ¶ 21 (omitting cash from a list of the consideration received in exchange for Class B Shares).

[20] Because the parties did not introduce the prospectus for the Class A Offering into evidence, and because the Subscription Notice does not list the liquidation preference of Class A Shares, *see generally* Subscription Notice, some doubt exists from the record as to the actual liquidation preference of Class A Shares.  Nonetheless, according to the RSA all the classes of preferred shares that Defendant planned to sell were to have a liquidation preference of U.S. $1 per share, RSA, Exh. A at 2, and the parties have not identified any other evidence indicating that Class A Shares had a different liquidation preference.  Thus, by a preponderance of the evidence the Court finds that Class A Shares had a liquidation preference of U.S. $1 per share.

to its common stockholders." Haas, *supra*, § 44(A)(2). Thus, if Defendant dissolved, each preferred shareholder would be entitled to receive $1 of Defendant's assets per share before any assets were distributed to common shareholders. But nothing actually required Defendant to distribute that amount to holders of the Shares. A liquidation preference need not be paid unless the company actually liquidates, and, furthermore, even in the event of liquidation, the company is required only to prioritize preferred shareholders over common ones, not actually to pay the liquidation preference in full or even in part. *See* Class B Prospectus at 17 ("You will not be entitled to receive any liquidation preference on the Class B Preferred Stock until after the claims of all of our creditors have been satisfied. If we do not have sufficient assets at the time of liquidation to satisfy those claims, you will not receive any liquidation preference on the Class B Preferred Stock."). The difference between value and liquidation preference was particularly salient following the Offerings and before the Mandatory Conversion, given that Defendant had only approximately $79 million in total shareholders' equity, *see* Presentation at 4, and therefore could not have paid the aggregate liquidation preference of approximately U.S. $180 million in full. As these circumstances make apparent, the value of a dollar is not the same as the value of the right to be paid a dollar before other investors are paid anything at all.

Section 1301 of the Indenture, in turn, is most plausibly interpreted as referring to the value of the equity interests sold in the Offerings, not to their aggregate liquidation preference. First, in section 1301 the term "U.S.$100,000,000" cannot be reasonably interpreted to refer to liquidation preference. In full, the relevant phrase reads, "at least U.S.$100,000,000 of [Defendant's] *Common Shares* (and/or other equity interests)." Second Supp. Inden. § 2.02(l) (emphasis added). Thus, the Indenture applies the $100 million figure not only to the Shares but also to Defendant's common stock. And common stock, unlike preferred stock, *does not have* a liquidation preference,

and could not coherently have one, since liquidation preference is the amount that must be paid to other shareholders before common shareholders receive any capital. It would be highly anomalous for a single contractual term—"U.S.$100,000,000"—to refer to different things depending on whether the equity interests sold were common stock or preferred stock, and Defendant has provided no argument supporting that varying reading. Because the Qualified Public Offering Threshold may be satisfied by the sale of any type of equity, then, the standard used to measure whether the Threshold has been satisfied must coherently apply to all types of equity, not just to preferred shares. Furthermore, interpreting the language of section 1301 to refer to value, not liquidation preference, accords more closely with ordinary usage. To speak of the dollar amount "of" some asset, ordinarily, is to refer to the value of that asset, not to some other feature of the asset. To say that a company sold $1 million of widgets, for example, would ordinarily mean that the value of the widgets sold was $1 million, not that their cost of manufacture was $1 million, or that they carried a warranty worth $1 million, or that any other quantity was equal to $1 million.

Lastly, this reading of section 1301 is further supported by the parties' own usage. The Second Supplemental Indenture does not itself discuss any of Defendant's preferred shares in any detail. The RSA, however, in which Defendant and its investors memorialized their plan to recapitalize the company, does discuss the preferred shares.[21] In particular, under the RSA the

---

[21] While the Second Supplemental Indenture and the RSA are separate agreements, the Court relies on the RSA to aid in interpreting the Second Supplemental Indenture for two reasons. First, "[a] writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." Restatement (Second) of Contracts § 202(2) (Am. L. Inst. 1981); *see also Davimos v. Halle*, 877 N.Y.S.2d 20, 21 (App. Div. 2009) ("It is a well-established principle of contract law that all contemporaneous instruments between the same parties relating to the same subject matter are to be read together and interpreted as forming part of one and the same transaction." (brackets and internal quotation marks omitted)); *Stonebridge Cap., LLC v. Nomura Int'l PLC*, No. 602081/08, 2009 WL 2045621, at *10 (N.Y. Sup. Ct. July 6, 2009) (citing section 202(2) of the Restatement to support interpreting one contract in light of others employed to

preferred shares that Defendant was to issue would be convertible, under certain circumstances, to Defendant's common stock.  RSA, Exh. A at 4-6.  That conversion rate was set based on the liquidation preference of the preferred shares:  in effect, preferred shareholders would spend their liquidation preference in order to buy common shares at specified prices of $.11 per common share for holders of Class A Shares and $.33 per share for holders of Class B Shares.[22]  *Id.*  In explaining this conversion procedure, the RSA refers explicitly to liquidation preference.  *E.g.*, *id.* at 4 ("Each share of Class A Preferred Stock shall be . . . convertible . . . into shares of Common Stock . . . at a price of US$0.11 per share of Common Stock per *US$1.00 of Liquidation Preference* at the time of such conversion (including accumulated and unpaid dividends to the date of such conversion) . . . ." (emphasis added)).  That the parties explicitly referenced the liquidation preference of the Shares when they intended to do so, as in the RSA, indicates that they would have referred to the

---

implement a single transaction); Williston on Contracts § 30:25 (4th ed. May 2023) ("Generally, all writings which are part of the same transaction are interpreted together.").  In determining whether multiple contracts must be interpreted together, "the primary standard is the intent manifested, viewed in the surrounding circumstances."  *Davimos*, 877 N.Y.S.2d at 21 (internal quotation marks omitted).  It cannot plausibly be disputed that Defendant and the Noteholders intended the RSA and the Second Supplemental Indenture to be part of the same transaction.  Each document explicitly references the other in its preamble.  *See* RSA at 1; Second Supp. Inden. at 1.  Furthermore, the RSA provides explicitly that its terms and conditions would govern the 2019 Amendment, RSA at 1-2, and, in Exhibit B, explicitly includes the text of the 2019 Amendment, *id.*, Exh. B at 4-9.  Indeed, the RSA even defines a single term, the "Recapitalization," to designate the single transaction governed by the RSA, the Second Supplemental Indenture, and the other agreements at issue in this case.  RSA at 1-2.

Second, even were the RSA and the Second Supplemental Indenture not part of the same transaction, the language of the RSA constitutes part of the course of dealing between Defendant and the Noteholders, since it is "previous conduct between [them] which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions."  Restatement (Second) of Contracts § 223(1) (Am. L. Inst. 1981).  Evidence as to the parties' course of dealing, in turn, "gives meaning to . . . their agreement."  *Id.* § 223(2); *see Evans v. Famous Music Corp.*, 807 N.E.2d 869, 873 (N.Y. 2004) (relying on course-of-dealing evidence to interpret a contract).

[22] Because the liquidation preference of Class A Shares and of Class B Shares was $1 per share, in effect each Class A Share entitled its holder to approximately nine common shares, and each Class B Share entitled its holder to approximately three common shares.

liquidation preference of those Shares in the Second Supplemental Indenture had they intended it to have that meaning, and that, therefore, the phrase "U.S.$100,000,000 of [Defendant's] Common Shares (and/or other equity interests)" did not refer to the liquidation preference of the Shares.

* * *

Under section 1301 of the Indenture, whether the Qualified Public Offering Threshold was met depends on the value, measured in dollars, of Class A Shares and Class B Shares that were sold in the Offerings. In determining that the Qualified Public Offering Threshold was met, however, the Board relied primarily not on the value of the Shares but instead on other quantities, including the balance sheet impact of the Offerings and the aggregate liquidation preference of the Shares. Such reliance was in error: section 1301 of the Indenture required the Board to determine whether the Qualified Public Offering Threshold had been met by determining whether Defendant sold $100 million of its equity interests, and the Board did not do so. Its errors, furthermore, were manifest. The Court did not identify them based on its own independent investigation into the value of the Shares. Instead, they were apparent on the face of the Board's decision: they could be identified, without considering extrinsic evidence or conducting a factual inquiry, simply by comparing the inquiry the Board actually performed with the inquiry that the Indenture required it to perform. Under section 1301 of the Indenture, the Board's determination that the Qualified Public Offering Threshold was met is conclusive absent manifest error. Because the Board erred in making that determination and because its error was manifest, however, the Board's determination is not conclusive.

### D.    The Qualified Public Offering Threshold

If the Board's determination that the Qualified Public Offering Threshold was met is not conclusive, then the task of applying section 1301 of the Indenture remains for the Court. Under

that provision, the Qualified Public Offering Threshold was met—and thus the Mandatory Conversion was authorized—only if Defendant sold at least $100 million of equity in the Offerings, which in turn would require Class A Shares and Class B Shares sold in the Offerings to have had a value of $100 million or more. Thus, the Court must determine the value of the Shares sold in the Offerings. While the manifest error standard forbade the Court from employing extrinsic evidence in evaluating the Board's determination as to whether the Qualified Public Offering Threshold was met, *see supra* II.B-C, no similar restriction applies to the Court's own examination of that question.[23] Thus, the Court will assess the value of the Shares based on the evidence in the record. Neither party has submitted any expert valuation of the Shares, which would likely constitute the optimal type of evidence as to their value. However, Plaintiffs have pointed to various facts in the record that provide evidence as to the value of the Shares, each of which supports the conclusion that the value of the Shares was not at least $100 million. By contrast, Defendant has neither submitted evidence nor advanced arguments in support of the conclusion that the value of the Shares was at least $100 million. By a preponderance of the evidence, then, the Court concludes that the Qualified Public Offering Threshold was not met.

Plaintiffs' primary argument in favor of their valuation of the Shares is based on the conversion ratio between the Shares and Defendant's common stock. Holders of the Shares had

---

[23] Section 1301 provides only that the Board's "determination shall be conclusive absent manifest error." Second Supp. Inden. § 2.02(l). Thus, for the Court to displace the Board's determination as to the Qualified Public Offering Threshold, it must be manifest *that the Board erred*, and the Court must then disregard the Board's determination once it finds that the Board manifestly erred. But section 1301 does not specify *what* error must be manifest—in particular, it does not provide that the Board's determination is conclusive unless the Qualified Public Offering Threshold was not met. Here, the Court has found that the Board manifestly erred in applying the standard found in section 1301 because it applied the wrong standard. That finding alone requires that the Board's determination be disregarded. Then, once the Board's determination is disregarded, nothing in section 1301 limits what evidence the Court may consider in its own assessment of the Threshold.

the right to convert them into common stock at any time; furthermore, Defendant had the right to carry out a mandatory conversion of the Shares into common stock upon satisfaction of the Qualified Public Offering Threshold.  *See* RSA, Exh. A at 4-5.  In either case, as mentioned, one Class A Share would entitle its holder to receive approximately nine common shares, and one Class B Share would entitle its holder to receive approximately three common shares.  *Id.* Defendant exercised that right and converted the Shares to common stock at the same February 10, 2020 Board meeting at which it converted the Notes to common stock.  Dkt. 83-44 at 1.  The approximately 39 million Class A Shares were converted into approximately 355 million common shares, and the approximately 141 million Class B Shares were converted into approximately 427 million common shares.[24]  Thus, the practical benefit of ownership of the Shares was an entitlement to receive shares of common stock, and the value of each Share should be tied to the value of the common stock that it entitled its owner to receive.  At all points throughout Defendant's recapitalization, its common shares traded publicly in Argentina, and the parties have stipulated both to Defendant's share price in Argentine pesos and to the peso-dollar conversion rate on three dates—August 8, 2019, when the RSA was signed, December 11, 2019, when the Shares were issued following the Offerings, and February 10, 2020, when the Shares were converted into common stock.  *See generally* Dkt. 82-1 ("Stip.").  No doubt, more sophisticated

---

[24] More precisely, Defendant issued 39,033,842 Class A Shares, Joint Proposed Findings ¶ 19, and 140,796,732 Class B Shares, *id.* ¶ 21.  As mentioned, each Share had a liquidation preference of one dollar.  *See supra* note 20 and accompanying text.  When the Shares were converted, the aggregate liquidation preference of the Shares tendered determined the number of common shares received in exchange:  one common share was exchanged for each $0.11 of aggregate Class A liquidation preference and for each $0.33 of aggregate Class B liquidation preference.  *See* RSA, Exh. A at 4-6.  At those rates, one Class A Share would be converted into approximately 9.09 common shares, and one Class B Share would be converted into approximately 3.03 common shares, so that all Class A Shares were converted into approximately 354,853,109 common shares, and all Class B Shares were converted into approximately 426,656,764 common shares, or approximately 781,509,873 common shares in total.

36

valuation methods could be employed given additional information about Defendant's business and financial prospects, but the Court can consider only the evidence that the parties have presented.  Using the first set of values, the Shares were worth approximately $78 million;[25] using the second, they were worth approximately $58 million;[26] and using the third, they were worth approximately $81 million.[27]  In each case, the value was less than $100 million.

While the Class B Shares were exchanged primarily for Notes and entitlements to deferred interest, and no evidence as to the value of those assets is before the Court, the Class A Shares were sold for cash or for property with a market value upon which the parties agree.  Thus, the price paid for the Class A Shares provides an alternative method for valuing them.  In the Class A Offering, the Class A Shares were sold for a price of $1 per share, Subscription Notice at 3, such that approximately 39 million Class A Shares were exchanged for approximately $39 million in cash, real estate, and a private corporate bond, *see* Presentation at 4; *see also* Joint Proposed Findings ¶ 20.  Thus, based on the Class A Offering the aggregate value of the Class A Shares would appear to be approximately $39 million.[28]  Because the market value of the consideration

---

[25] On August 8, 2019, Defendant's stock traded at 4.52 pesos per share, Stip. ¶ 1, and one peso was worth 0.021974 dollars, *id.* ¶ 2.  Thus, each common share was worth approximately 0.099323 dollars.  At that price, the approximately 781,509,873 common shares into which the Shares were ultimately converted, *see supra* note 24, were worth approximately $77,621,499.

[26] On December 11, 2019, Defendant's stock traded at 4.4 pesos per share, Stip. ¶ 3, and one peso was worth 0.0168436 dollars, *id.* ¶ 4.  Thus, each common share was worth approximately 0.0741118 dollars.  At that price, the approximately 781,509,873 common shares into which the Shares were ultimately converted, *see supra* note 24, were worth approximately $57,919,135.

[27] On February 10, 2020, Defendant's stock traded at 6.3 pesos per share, Stip. ¶ 5, and one peso was worth 0.016482 dollars, *id.* ¶ 6.  Thus, each common share was worth approximately 0.103837 dollars.  At that price, the approximately 781,509,873 common shares into which the Shares were ultimately converted, *see supra* note 24, were worth approximately $81,149,328.

[28] This value for the Class A Shares, derived from their cash price, can be compared to the value derived from their conversion rights to common shares, *see supra* notes 24-27 and accompanying text.  Separated out from the Class B Shares, the 39,033,842 Class A Shares issued

exchanged for the Class B Shares is not known, this approach cannot be used to value them directly. However, the relationship between the conversion rights of each class of Shares suggests how they might be valued relative to each other: because each Class B Share entitled its holder to one-third the number of common shares that each Class A Share did, each Class B Share can be valued at one-third the price of a Class A Share. Because the Cash A Shares were sold for $1 per share, the Class B Shares would then be worth $0.33 per share, and the approximately 141 million Class B Shares issued, *see supra* note 24, would be worth approximately $47 million in the aggregate. Adding that amount to the $39 million value of the Class A Shares, this approach would value all the Shares issued in the Offerings at approximately $86 million in the aggregate—an amount that is also less than $100 million.[29]

Lastly, the Presentation the Board viewed on February 10, 2020 shows that Defendant's shareholders' equity following the Offerings was approximately $79 million, which provides evidence in two respects as to the value of the Shares. First, while Defendant's full balance sheet has not been entered into evidence, and thus the Court cannot directly identify whether and how Defendant's shareholders' equity was divided on its balance sheet among its various classes of shareholders, the $79 million figure identifies the total book value of all the equity interests in the company. Because the Shares were a subset of the equity interests in Defendant, their book value could not have exceeded the company's total book value of approximately $79 million. That value,

---

in the Class A Offering were entitled their owners to approximately 354,853,109 common shares, *see supra* note 24. And using the three stipulated prices for Defendant's common shares of 0.099323 dollars, 0.0741118 dollars, and 0.016482 dollars, *see supra* notes 25-27, those common shares were worth $35,244,891 on August 8, 2019, $26,298,817 on December 11, 2019, and $36,846,740 on February 10, 2020. Thus, relying on the Class A Shares' cash price produces a higher valuation than relying on their conversion rights does.

[29] More precisely, at $1 per share, the 39,033,842 Class A Shares would be worth $39,033,842, and at $0.33 per share, the 140,796,732 Class B Shares would be worth $46,932,422, for a total value of $85,966,086.

too, is less than $100 million. Second, Defendant's shareholders' equity represents the value that would be available to the shareholders collectively in the event of the company's liquidation, once all the company's liabilities had been paid off. If only approximately $79 million of shareholders' equity remained, then in the event of liquidation the total value of all equity interests in Defendant would equal only approximately $79 million. Due to the Shares' liquidation preference, their owners would receive the entirety of that $79 million in shareholders' equity, and nothing would remain for the common shareholders. But $79 million is less than $100 million. Thus, following the Offerings the value of the Shares' liquidation preference was likely less than $100 million.

None of these forms of evidence constitutes a formal, comprehensive valuation of Defendant. Each form of evidence, though, supports the conclusion that the Shares were worth less than $100 million. By contrast, Defendant has presented no evidence affirmatively supporting the conclusion that the Shares were worth more than $100 million, as required to trigger the Mandatory Conversion. Indeed, Defendant's trial briefs do not even affirmatively argue that the Shares were worth that amount, or that the Board's determination was correct, instead arguing only that the Board's determination, whether or not erroneous, was not manifestly erroneous. *See* Deft. Br. at 12 ("The Board's Determination That the Global Offer Comprised of at Least U.S. $100 Million in [Defendant's] Equity Was not Manifestly Erroneous"); Deft. Resp. at 10 (same). Based on the evidence admitted, the Court finds by a preponderance of that evidence that the Qualified Public Offering Threshold was not met. Consequently, the Mandatory Conversion was not authorized by section 1301 of the Indenture, Plaintiffs continue to own the Notes they purchased on August 3, 2017, and as Noteholders they are entitled to continuing payments of interest as it comes due.

### III. Conclusion

For the foregoing reasons, the Court concludes that Plaintiffs continue to own the Notes, and that Defendant breached the Indenture in failing to pay interest pursuant to the terms of the Notes.  By July 31, 2023, the parties shall submit a proposed judgment consistent with these Findings of Fact and Conclusions of Law, or, if they believe there remain additional disputed questions that preclude the entry of judgment, they shall submit a joint letter identifying those disputes.  While Plaintiffs additionally requested attorneys' fees, *see* 10/19/22 Tr. at 33:15, they have identified no cogent basis upon which they might be entitled to fees, and their request is therefore denied.

SO ORDERED.

Dated: July 17, 2023
      New York, New York

_____
JOHN P. CRONAN
United States District Judge